**SO ORDERED.**

**SIGNED this 17th day of December, 2015.**



Janice Miller Karlin
United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:                                        Case Nos.

|  |  |
|---|---|
| **Wark** | **15-40558** |
| **Tetuan/Milholen** | **15-40566** |
| **Ellsperman** | **15-40609** |
| **Blacksmith** | **15-40641** |
| **Rayton** | **15-40644** |
| **Neu** | **15-40647** |
| **Tinkham** | **15-40654** |
| **Parker** | **15-40655** |
| **Hayes** | **15-40661** |
| **Huggins,** | **15-40681** |

**Debtors.**

---

### Memorandum Opinion and Order

Can a below median income debtor in bankruptcy, impoverished and struggling to meet monthly financial obligations, choose to file a Chapter 13 petition instead of a Chapter 7 petition? What if that debtor wishes to have assistance of competent counsel to navigate the complex bankruptcy system with its myriad forms, rules and schedules, to help ensure she exits bankruptcy with a discharge and the best fresh

start the law allows? What if that counsel comes with a comparatively high $3100 presumptively reasonable fee for a Chapter 13 case, but will charge "only" $1800 to handle a Chapter 7 case? What if the debtor, instead of choosing to delay filing bankruptcy while attempting to save funds to pay counsel for the cheaper Chapter 7 option, or perhaps worse yet, choosing to navigate the bankruptcy system pro se, elects to instead immediately file a Chapter 13 petition where she can pay her counsel's fee through her Chapter 13 plan? What justification must the debtor present for her choices? Is it enough if she is being garnished 25% of her income? How about merely harassing phone calls from her creditors? Or is something more required?

The United States Trustee (the "U.S. Trustee") urges this Court to set a high threshold for debtors to choose a Chapter 13 when they are otherwise eligible for a Chapter 7, arguing that debtors should not have this choice. Instead, he argues debtors cannot choose to file a Chapter 13 petition and plan unless they can show "special circumstances" justifying the filing of a Chapter 13 petition and plan, and being unable to raise the cash to hire competent counsel is not such a special circumstance in the U.S. Trustee's estimation. The law in the Tenth Circuit, however, has not so developed, and this Court instead looks to the totality of the circumstances surrounding each debtor's filing to determine whether these Debtors have filed their Chapter 13 bankruptcy plan in good faith, as required by 11 U.S.C. § 1325(a)(3).[1]

The Court conducted trials in each of these cases, and considered the Tenth

---

[1] Unless noted otherwise, all future statutory references are to title 11 of the United States Code, the Bankruptcy Code.

Case 15-40644   Doc# 96   Filed 12/17/15   Page 2 of 107

Circuit's totality of circumstances test for each case before concluding that Debtors did not lack good faith in filing their particular Chapter 13 petition and plan. In a few of the cases discussed, the U.S. Trustee's objections to confirmation based on feasibility under § 1325(a)(6) are well taken, and the particular facts of those cases will be discussed in detail. Ultimately, for the majority of the cases, the Court finds no fault in the choices Debtors have made, and declines to take the U.S. Trustee's suggestion to supplant Debtors' choices with his own.

## I.    Background and Procedural History

Each of these Debtors filed Chapter 13 petitions and plans with the assistance of experienced bankruptcy counsel, and each lawyer sought the Court's "presumptively reasonable fee"[2]—ranging from from $3150 to $3400. Each Debtor has proposed a plan that pays those attorneys's fees, the trustee fee of up to 10% on all funds disbursed, and the $310 filing fee over at least 36 months. A few of the cases project marginal additional distributions to unsecured, priority creditors, but none project payment toward general unsecured debt. None of the Debtors own a home, some do not even own a car, and most have no  secured collateral they are trying to pay for or otherwise

---

[2] In 2007, this Court heard evidence to generally determine how many hours it takes to represent an "average" debtor for the life of the Chapter 13 case from first intake through discharge. The Court then set a "presumptively reasonable fee," meaning that if counsel sought that fee, it was likely the fee would not be challenged. *See In re Beck*, No. 06-40774 (Doc. 35), 2007 Bankr. LEXIS 517, at *22–28 (Bankr. D. Kan. Feb. 21, 2007) (case not available on Westlaw). Contrary to the U.S. Trustee's suggestion, only if that fee is consumed with services performed at a reasonable hourly rate is an attorney permitted to seek additional fees during the pendency of a Chapter 13 case. *Id.* at *41–44.

save through their bankruptcy.[3] Each Debtor's income is below median, meaning their annualized current monthly income is less than the median family income for a Kansas household of applicable size—and in almost every case, dramatically less, and each Debtor is committed to making plan payments for a minimum of three years.

The U.S. Trustee objected to confirmation of each of the Chapter 13 plans, generally arguing that by definition both the petition and plan of each Debtor were not filed in good faith under § 1325(a)(3) and (a)(7) because each Debtor chose to file under Chapter 13 when they could have filed under Chapter 7. He also argued each plan was not feasible under § 1325(a)(6) and thus moved to convert each case to one under Chapter 7. The U.S. Trustee does not argue that Debtors have mislead the Court or acted fraudulently. In fact, the U.S. Trustee admits both that Debtors have "done nothing wrong" and that each Debtor needs bankruptcy relief.

In many of these cases, the Chapter 13 Standing Trustee, Jan Hamilton (the "Standing Trustee"), also objected to confirmation (and moved to dismiss) based on a lack of good faith in filing the plan. And finally, in a few of the cases, the Standing

---

[3] Ironically, had the Debtors herein been less responsible, say, if they had allowed payments to become delinquent on a car loan or had an arrearage on a home loan, it is likely the U.S. Trustee would not have objected to their proposed plans because in his opinion, there would have been a "need" for Chapter 13 relief. Another way of looking at our Debtors, is if they had been less poor, so that they could have afforded such things as houses and cars, they may have had debt on that type of collateral that needed adjusted. The Debtors in these cases are simply too poor to have such debts. *See In re Denis*, No. 10-16784-B-13, 2010 WL 9489202, at *7 n.10 (Bankr. E.D. Cal. Nov. 1, 2010) (discussing trustee's good faith challenge to the debtors' plan and stating: "Ironically, if the Debtors had not maintained the payments on their first mortgage, or had a delinquent car loan, and had an arrearage to pay through the chapter 13 plan, the court does not believe the Trustee would have objected.").

-4-

Trustee additionally objected to confirmation (and moved to dismiss) based on feasibility.

Because the objections and motions in these cases deal with the same legal challenges, the Court took evidence in each case serially, and will address all the cases within this Opinion.[4] Additional facts about each case will be introduced as each case is individually analyzed.

No one disputes that this Court has jurisdiction to decide these matters,[5] as they are core proceedings.[6]

## II. Legal Standards

### A. Chapter 13 Reorganization Versus Chapter 7 Liquidation

The two goals of bankruptcy are oft-stated: "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor'"[7] — and everyone agrees these Debtors squarely fall within this description. This fresh

---

[4] All parties agreed to allow John Hooge, a local, experienced debtors' attorney, to file an amicus brief in each case, and the Court has fully considered that brief along with the parties' motions and objections, the trial briefs filed in each case, the evidence presented at each trial, and the arguments of Counsel.

[5] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and 11 U.S.C. § 1334(a) and (b) and by operation of a Standing Order dated August 1, 1984, effective July 10, 1984, referenced in D. Kan. Rule 83.8.5, wherein the District Court for the District of Kansas referred all cases and proceedings in, under, or related to Title 11 to the Districts' bankruptcy judges.

[6] See 28 U.S.C. § 157(b)(2)(A) and (L) (stating that "matters concerning the administration of the estate" and the "confirmation of plans" are core proceedings that a bankruptcy judge has jurisdiction to hear and determine).

[7] *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 287 (1991)).

start must be balanced, however, with the additional goal of ensuring "the fair and equitable treatment of the creditors of a debtor in bankruptcy."[8]

Although the overarching bankruptcy goals are the same, the Chapter 13 bankruptcy process significantly differs from the Chapter 7 bankruptcy process. "Chapter 13 authorizes an individual with regular income to obtain a discharge after the successful completion of a payment plan approved by the bankruptcy court."[9] In a Chapter 13 bankruptcy, "the debtor retains assets, often his home, . . . subject to [that] court-approved plan."[10] Repayment plans in Chapter 13 cases last three to five years (the applicable commitment period), depending on whether the Chapter 13 debtor has monthly income below or above median.[11] Plan payments are made from a debtor's "future earnings or other future income."[12]

That three to five year commitment period, while onerous in the sense that the

_____

[8] *In re Westby*, 473 B.R. 392, 401 (Bankr. D. Kan. 2012); *see also Schwab v. Reilly*, 560 U.S. 770, 791–92 (2010) ("The Code limits exemptions in this fashion because every asset the Code permits a debtor to withdraw from the estate is an asset that is not available to his creditors. Congress balanced the difficult choices that exemption limits impose on debtors with the economic harm that exemptions visit on creditors."); *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (stating that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt," but noting that statutory limits on that fresh start, due, for example, to discharge exceptions, limit this fresh start (internal quotation marks omitted)).

[9] *Marrama*, 549 U.S. at 367.

[10] *Harris v. Viegelahn*, ___ U.S. ___, 135 S. Ct. 1829, 1834 (2015).

[11] *See In re Lanning*, 545 F.3d 1269, 1275 (10th Cir. 2008) (describing applicable commitment period for below-median and above-median debtors).

[12] *Harris*, 135 S. Ct. at 1834.

debtor is continuously under the jurisdiction of the bankruptcy court, provides some relief for the debtor regarding his nondischargeable unsecured debt. For example, collection of unsecured taxes and student loans are stayed during the pendency of the Chapter 13 case due to the bankruptcy automatic stay, whereas those creditors could commence collection against the Chapter 7 debtor immediately after discharge is entered in the comparatively much shorter Chapter 7 case.[13] And because debtors may not incur debt without authorization, debtors also must learn to live within a budget during the time they are under the Court's jurisdiction. Finally, if they have retained counsel to assist them, debtors also have access to legal support for the duration of their Chapter 13 bankruptcy.

The Chapter 7 proceeding is a much faster process: in a Chapter 7 proceeding, "the debtor's assets are immediately liquidated and the proceeds [are] distributed to creditors."[14] "Chapter 7 allows a debtor to make a clean break from his financial past, but at a steep price: prompt liquidation of [his or her] assets."[15]

There are also differences in who is eligible to file a petition under each Chapter of the Bankruptcy Code. The Chapter 13 process is "wholly voluntary,"[16] but Chapter

---

[13] *See, e.g.*, *In re Waugh*, 109 F.3d 489, 493 (8th Cir. 1997) (describing the automatic stay as it relates to collection of tax debt).

[14] *Harris*, 135 S. Ct. at 1834.

[15] *Id.* at 1835; *see also Marrama*, 549 U.S. at 367 ("Chapter 7 authorizes a discharge of prepetition debts following the liquidation of the debtor's assets by a bankruptcy trustee, who then distributes the proceeds to creditors. . . . Under Chapter 7 the debtor's nonexempt assets are controlled by the bankruptcy trustee[.]").

[16] *Harris*, 135 S. Ct. at 1835.

13 relief is only available to "an individual with regular income" who owes debts less than a statutorily specified sum.[17] To file a Chapter 7 petition, the debtor must pass a "means test:" if the debtor's "current monthly income" is less than or equal to the median income for a family in Kansas, then they are presumed to be eligible to file a Chapter 7 petition.[18] In addition, to be eligible for a Chapter 7 discharge, a debtor cannot have received a Chapter 7 discharge in the last eight years, or a Chapter 13 discharge in the last six years.[19] To contrast, a debtor cannot receive a Chapter 13 discharge if they have received a discharge in a Chapter 7 case within the last four years, or in a Chapter 13 case in the last two years.[20]

Postpetition wages are also treated differently by Chapter 13 and Chapter 7. "In a Chapter 13 proceeding, postpetition wages are property of the estate and may be collected by the Chapter 13 trustee for distribution to creditors. In a Chapter 7 proceeding, those earnings are not estate property; instead, they belong to the debtor."[21] Because of this differing treatment, the Supreme Court has noted: "Proceedings under Chapter 13 can benefit debtors and creditors alike. Debtors are

---

[17] § 109(e). The debt limits, also found in § 109(e), are: "noncontingent, liquidated, unsecured debts of less than $383,175 and noncontingent, liquidated, secured debts of less than $1,149,525."

[18] *See Lanning*, 545 F.3d at 1272 n.2 (describing means test). Each of these Debtors is far below median. For example, the median income for a family of one is $45,980, which equates to about $3832 per month. As will be shown in the following discussion, Debtors' monthly incomes place them nowhere near the median income numbers.

[19] § 728(a)(8)–(9).

[20] § 1328(f).

[21] *Harris*, 135 S. Ct. at 1834.

Case 15-40644    Doc# 96    Filed 12/17/15    Page 8 of 107

allowed to retain their assets, commonly their home or car. And creditors, entitled to a Chapter 13 debtor's "disposable" postpetition income, usually collect more under a Chapter 13 plan than they would have received under a Chapter 7 liquidation."[22]

There are also differences between the discharges available in a Chapter 13 case versus a Chapter 7 case. For example, with a Chapter 13 discharge, non-support debts owed in relation to a divorce or property settlement are dischargeable, while they are nondischargeable in a Chapter 7 case.[23]

Finally, there are differences in the collectibility of attorney's fees associated with each Chapter. Because of the Supreme Court's decision in *Lamie v. United States Trustee*,[24] which held that the Bankruptcy Code does not permit debtor's counsel to be compensated from estate funds,[25] attorneys filing Chapter 7 petitions for debtors must collect their fee up front lest the attorney risk that fee being rendered dischargeable as a prepetition debt.[26] It is also commonly believed that the significant amendments to the Bankruptcy Code in 2005, which tightened the eligibility requirements for Chapter 7 bankruptcy, "made the process more complicated—increasing the need for

---

[22] *Id.* at 1835. This is, of course, highly fact dependent. For example, a debtor could receive a higher paying job while his Chapter 13 case was pending, and thus have more funds available for a higher plan payment. But a debtor could also lose a job or earn less.

[23] *In re Okrepka*, 533 B.R. 327, 333 (Bankr. D. Kan. 2015) (describing Code's treatment of support debts and property settlements and the dischargeability—or lack thereof—of each).

[24] 540 U.S. 526 (2004).

[25] *Id.* at 538–39.

[26] *In re Puffer*, 674 F.3d 78, 84 (1st Cir. 2012) (concurring opinion).

legal advice and, in turn, the cost of filing for bankruptcy."[27]

This Court has had prior occasion to consider attorney's fees in Chapter 13 cases filed in this District. In *Beck*,[28] the Court determined that a "presumptively reasonable fee should be adopted" for handling Chapter 13 cases,[29] and set that fee at $2800 to $3700 depending on the complexity of the case.[30] Important for this Opinion, the Court also considered "simple 'fee only' Chapter 13 case[s]," which the Court defined as:

> cases where a debtor's schedules and plan reveal no "visible" reason to file a Chapter 13 case instead of a Chapter 7 case, which can typically be filed for a considerably lower attorney fee. In "fee only" cases, the schedules typically reveal no house or car in jeopardy, or other issue where a Chapter 13 would prove strategically more advantageous for the particular debtor. The speculation is that the only reason the debtor elected to file under Chapter 13 is because he has no ability to pay the admittedly lesser Chapter 7 attorney fee up front; debtor's counsel then takes his higher Chapter 13 fee over the life of the Chapter 13 case.[31]

Regarding fee only cases, the Court recognized that these "simple" cases may not

---

[27] *Id.* The 2005 amendments also added a provision in § 526(a)(4) prohibiting "debt relief agencies"—which in turn is defined to include debtors' attorneys in § 101(12A)— from advising persons to incur more debt in contemplation of filing a bankruptcy case. Ironically, the U.S. Trustee questioned each of the Debtors why they couldn't simply borrow the money to pay their attorney's fee up front. This seems to violate the spirit, if not the letter, of the 2005 amendments.

[28] No. 06-40774 (Doc. 35), 2007 Bankr. LEXIS 517 (Bankr. D. Kan. Feb. 21, 2007).

[29] *Id.* at *14.

[30] *Id.* at *23–24. This presumptive fee was later altered by the "Professional Fee and Expenses Guidelines in Bankruptcy Cases Pending Before The Honorable Janice Miller Karlin, United States Bankruptcy Judge," dated January 7, 2010, and available on this Court's public website. The current presumptive fee ranges from $3100 to $4200, depending on the particular factors involved in that case (e.g., above or below median income, conduit mortgages, the necessity of filing motions to extend the automatic stay under § 362(c)(3), etc.).

[31] *Id.* at *19–20 (internal footnotes omitted).

justify charging the presumptive fee, and admonished debtors' counsel to adjust their fee to match the complexity of the issues in the particular case.[32]

Debtors have a choice to file their bankruptcy case, whether Chapter 13 or Chapter 7, pro se. This Court in *Beck*, however, stressed the importance of debtors retaining counsel to assist them. The Court stated:

> It is absolutely imperative that competent counsel be motivated to seek, accept and ably handle Chapter 13 cases. That motivation starts with being fairly compensated for the work they perform. The complexity and importance of the work, alone, justify such compensation, but there are other reasons able counsel are vital to the system. The most important reason is that this Court rather routinely sees pro se debtors "give away" rights or property that they would otherwise be legally entitled to retain because of their ignorance of the law. A second, albeit less significant, reason is that pro se debtors also increase the Court's and Clerk's costs of efficiently handling bankruptcies.[33]

This Court concluded that "having enough able counsel available to provide debtors the

---

[32] *Id.* at *22. Based on this language in *Beck*, in a few of the cases herein, the Standing Trustee filed objections to confirmation (and motions to dismiss) arguing that the attorney's fee proposed in the plan was too high given the lack of complexity of the case. As a result of the necessity for Debtors' counsel to prepare for and try these fee only cases, the Standing Trustee has now concluded that the fees originally sought in each of these cases have been consumed with work provided at a reasonable hourly rate. Accordingly, he has notified the Court he will be withdrawing his objections/motions based on the proposed attorney's fee in all cases in which they were filed. Because they will be withdrawn, they will not be further addressed in this Opinion.

[33] *Id.* at *9 (internal footnotes omitted). Here are two typical and recent examples, but the Court sees many others. A Chapter 7 Trustee recently objected to the attempt of two pro se debtors to exempt their cars, stated to be worth $3700 and $3000, respectively, not because those exemptions are not allowed under state law (which pursuant to K.S.A. § 60-2304(c) generally allows Kansas debtors to exempt vehicles valued up to $20,000), but because those unrepresented debtors relied on the wrong statute. *See In re Luster*, No. 15-40793, Doc. 49 (Trustee's Objection to Debtors' Exemptions). Another Chapter 7 Trustee moved to dismiss a pro se debtor's case for many reasons, including the pro se debtor's failure to obtain the credit counseling certificate prior to filing a petition, as required by § 109(h)(1). This alone is typically a fatal mistake. *See In re Board*, No. 15-40967, Doc. 14 (Trustee's Motion to Dismiss).

-11-

relief that Congress, and the Kansas legislature through statutory exemptions, have afforded Kansas debtors, is critical to the proper operation of the system."[34]

The Court has not had occasion to consider the average cost of attorneys' fees for Chapter 7 cases in this District, but notes that testimony was received placing the range at $1000 to $3500, with most attorneys charging $1800.

### B.    Good Faith in Filing the Chapter 13 Plan[35]

Debtors, as proponent of their Chapter 13 plan, bear the burden of proof to show that their plans meet the requirements for confirmation found in § 1325(a).[36] Specifically, § 1325(a)(3) requires that a Chapter 13 plan be "proposed in good faith and

---

[34] *Beck*, 2007 Bankr. LEXIS, at *11.

[35] Because the analysis for whether a Chapter 13 *petition* was filed in good faith is the same—totality of the circumstances—as the analysis for whether a Chapter 13 *plan* was filed in good faith, the Court will not perform a separate inquiry as to each. *See Brown v. Gore (In re Brown)*, 742 F.3d 1309, 1316 (11th Cir. 2014) (applying same non-exhaustive factors to both the 1325(a)(3) and 1325(a)(7) challenges and totality of circumstances test); *Gier v. Farmers State Bank of Lucas, Kan. (In re Gier)*, 986 F.2d 1326, 1329 (10th Cir. 1993) (concluding that bankruptcy courts should consider the totality of the circumstances to determine whether a Chapter 13 petition has been filed in bad faith and that the appropriate question is "whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of" Chapter 13); *In re Rodriguez*, 487 B.R. 275, 282 (Bankr. D.N.M. 2013) (noting that the totality of the circumstances test is used for both determining "whether a Chapter 13 petition was filed in good faith and whether a proposed Chapter 13 plan was filed in good faith" and that the factors for each are similar, but not identical). In the cases under review, the petitions and plans were filed nearly simultaneously; the Court will refer throughout to good faith as it relates to the filing of Debtors' plans, but the conclusions reached will apply equally to good faith in filing the petitions.

[36] *Alexander v. Hardeman (In re Alexander)*, 363 B.R. 917, 921–22 (10th Cir. BAP 2007) (noting that "courts have concluded that the proponent of a Chapter 13 plan has the burden of proof to show that the § 1325(a) tests have been met" and agreeing with this line of cases; specifically holding that the debtor has the burden of proving good faith under § 1325(a)(3)).

-12-

not by any means forbidden by law."[37]

The phrase "good faith" is not defined by the Code. While the Tenth Circuit has generally ruled on good faith challenges to Chapter 13 plans, it has not had occasion to opine on fee only Chapter 13 plans in the face of § 1325(a)(3) good faith challenges. Other appellate courts, however, have addressed this issue. The Circuits to consider challenges to fee only plans unanimously agree that fee only Chapter 13 cases are not per se filed in bad faith, although the outcomes in the particular cases have varied.

For example, the Eleventh Circuit considered the issue in *In re Brown*.[38] In *Brown*, the debtor's income mainly consisted of Social Security disability benefits, and after deducting monthly expenses, he had net income of $150 per month.[39] The debtor had almost no personal property and no real property.[40] His debt consisted of unsecured, nonpriority claims.[41] The debtor's proposed Chapter 13 plan proposed monthly payments of $150 for thirty six months, for a total payment of $5400.[42] From this amount, $2070 would be paid to his attorney (for the attorney's fees, a credit

---

[37] Regarding good faith in filing the Chapter 13 petition, § 1325(a)(7) requires that "the action of the debtor in filing the petition was in good faith."

[38] 742 F.3d 1309 (11th Cir. 2014).

[39] *Id.* at 1310.

[40] *Id.*

[41] *Id.* at 1311.

[42] *Id.*

report, and the debtor's required credit counseling), $281 would pay the filing fee,[43] and 4.5 percent of each payment would pay the Chapter 13 trustee's commission.[44] After these payments were made, scheduled creditors would receive $2806, or about 17% of the amount owed.[45]

The Eleventh Circuit upheld the bankruptcy court's decision that the debtor in *Brown* had *not* proposed his plan in good faith under § 1325(a)(3) under the required abuse of discretion standard.[46] The bankruptcy court found that "the only reason [the debtor] filed a Chapter 13 petition, instead of a Chapter 7 petition, was so [the debtor] could pay the $2000 attorney's fee through installments under a Chapter 13 plan."[47] The bankruptcy court utilized substantially the same multi-factor, totality of the circumstances test used within this Circuit,[48] and in analyzing "the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13," found the factor did not fall in the debtor's favor, as the debtor "sought relief under chapter 13, not to adjust debts and preserve assets, but to accommodate payment of attorney

---

[43] The bankruptcy court noted that the debtor would qualify for an *in forma pauperis* waiver of this filing fee in a Chapter 7 case, "but no such waiver is available in Chapter 13 cases." *Id.* at 1312.

[44] *Id.* at 1311.

[45] *Id.*

[46] *Id.* at 1317.

[47] *Id.* at 1312–13.

[48] *Id.* at 1313 (discussing use of *Kitchens* factors, found in *In re Kitchens*, 702 F.2d 885, 888-89 (11th Cir. 1983), which relied on *In re Estus*, 695 F.2d 311 (8th Cir. 1982), the same case supporting the Tenth Circuit's *Flygare* factors, discussed below).

-14-

fees."[49] The bankruptcy court "stressed the abysmal failure rate of chapter 13 cases generally" in that district, and the burden the plan would have on the Chapter 13 trustee to "collect and distribute plan payments . . . . to pay his attorney's fees."[50]

In reviewing the bankruptcy court's decision on this fee-only plan under the required abuse of discretion standard, the Eleventh Circuit concluded:

> [The debtor's] Chapter 13 plan was all about attorney's fees, and not [the debtor's] best interest or the creditors. While the choice of chapter is one made by the debtor, . . . this Chapter 13 plan was for the benefit of the lawyer and not in the best interest of the debtor. Indeed, there was no evidence in this particular record revealing unique circumstances that would lead to the conclusion that it was in [the debtor's] best interest to file under Chapter 13.

So while the *Brown* court affirmed the finding that the debtor's plan was not filed in good faith in that case, it looked to the totality of the circumstances of the particular case rather than adopting any per se rule. It also noted it had no evidence to support a finding that it was in the debtor's best interest to file the Chapter 13 plan.

When the Fifth Circuit, in *In re Crager*,[51] applied similar standards of law, it reached a different result even though the debtor's circumstances in *Crager* were very similar to those of the debtor in *Brown*. The *Crager* debtor also had a minimal income

---

[49]  *Id.*

[50]  *Id.* at 1315. The Court notes that the Chapter 13 process is far different in this District. As discussed below: 1) exhibits admitted into evidence revealed that this District has the opposite of an "abysmal" success rate, 2) there was credible testimony from each Debtor supporting a finding that it was in the Debtors' best interest, and thus they were themselves benefitted, to be able to seek relief considerably quicker via the Chapter 13 route, and 3) the Standing Trustee credibly testified that administering fee only cases is no more burdensome on him and his staff than administering any other case.

[51]  691 F.3d 671 (5th Cir. 2012).

-15-

consisting of Social Security benefits, had mainly unsecured nonpriority debt (although the debtor in *Crager* also had a mortgage on real property), and would have needed to save for over a year to raise the money "to pay the up-front costs for a Chapter 7 bankruptcy."[52] The bankruptcy court in *Crager* also applied a totality of the circumstances test to determine the good faith of filing an "attorney fee centric" Chapter 13 plan, and noted that based on the rising costs of medical care, the debtor "had a legitimate fear that a future medical problem" might cause her to take on more debt and the need to file another Chapter 13 case.[53]

The Fifth Circuit also stated that "the bankruptcy court had the opportunity to judge [the debtor's] credibility as a witness and found credible her proffered reasons for filing a Chapter 13 petition," and that it was a "responsible decision" to file a Chapter 13 petition "given her particular circumstances."[54] Significantly, the Fifth Circuit had before it a record showing why the debtor chose to file her Chapter 13 plan, and it supported that choice based on the totality of the circumstances surrounding the case.

The First Circuit, in *In re Puffer*,[55] is the only other Circuit court to address the issue. In *Puffer*, the Court also applied the totality of the circumstances test to determine whether the equitable concept of good faith was met by the filing of a "fee-

---

[52] *Id.* at 674.

[53] *Id.* at 675.

[54] *Id.*

[55] 674 F.3d 78 (1st Cir. 2012).

centric" Chapter 13 plan.[56] While also rejecting the position that fee only plans are per se in bad faith, the *Puffer* court did note its concerns:

> The fundamental purpose undergirding Chapter 13 is to allow a debtor to pay his creditors over time, and fee-only plans, by definition, leave the vast majority of debts unsatisfied. Moreover, fee-only arrangements may be vulnerable to abuse by attorneys seeking to advance their own interests without due regard for the interests of debtors; and such plans, by their very nature, create that appearance.[57]

The *Puffer* court went on to conclude that there could be "special circumstances, albeit relatively rare" in which the "odd" arrangement of a fee-only plan would be justified, reiterating that good faith would have to be assessed on a case by case basis.[58] The debtor proposing a fee-only plan in the First Circuit "carries a heavy burden of demonstrating special circumstances that justify its submission."[59]

The First Circuit ultimately remanded the case for a determination whether the "special circumstances sufficient to justify" the fee only plan were present, because the bankruptcy court had not considered the totality of the circumstances in its good faith

---

[56] *Id.* at 82.

[57] *Id.* at 82–83.

[58] *Id.* at 83.

[59] *Id.* The concurring opinion in *Puffer* rejected this approach, and stated he "would leave application of the [totality of the circumstances] test entirely to bankruptcy judges instead of prescribing a rule requiring 'special circumstances' limited to 'relatively rare' instances." *Id.* at 85. The concurring opinion concluded that bankruptcy courts would be able to distinguish between fee only plans filed in good faith and plans that would be an abuse of the system, and determined that "the goals of Chapter 13 will be amply protected when the totality of the circumstances test is thoughtfully applied, without threshold limitation, by bankruptcy judges." *Id.* at 87–88. This concurring opinion supports the position this Court is taking.

analysis.[60] Again, it is significant to note that the First Circuit did not have a record before it to determine whether such "special circumstances" had been shown in the *Puffer* case, but gave examples that might constitute such circumstances, such as: showing "a pressing need for [counsel's] services, that [the debtor] could not secure adequate representation that he could afford without resorting to a fee-only plan, or that it was infeasible to proceed pro se," as well as showing a "compelling reason" why a three-month wait to save money to pay for a Chapter 7 case would be "intolerable."[61]

Myriad bankruptcy courts have also considered fee only plans and § 1325(a)(3) challenges,[62] although because of the fact intensive nature of the good faith inquiry, the

---

[60] *Id.* at 83.

[61] *Id.*

[62] *See, e.g., Ingram v. Burchard (In re Ingram)*, 482 B.R. 313, 323 (N.D. Cal. 2012) (finding that the Bankruptcy Court did not err in denying the debtor's confirmation as the fee-only plan eliminated unsecured debt with no repayment to unsecured creditors, contrary to the purposes of Chapter 13); *In re Rolince*, No. 14-33871, 2015 WL 1321510, at *2 (Bankr. N.D. Ohio Mar. 17, 2015) (finding that the debtor, who was ineligible for Chapter 7 relief, did not file her Chapter 13 plan in good faith because the plan failed to provide for a "repayment of pre-petition debt consistent with the debtor's available resources," a fundamental purpose of Chapter 13, as it was unlikely to result in any actual payment to her unsecured creditors and would pay only attorney's fees and trustee fees); *In re Barnes*, No. 12-06613-8-RDD, 2013 WL 153848, at *12 (Bankr. E.D.N.C. Jan. 15, 2013) (finding that attorney fee only Chapter 13 plans are not per se bad faith, but that the debtor's plan, which included a provision allowing the debtor to exit Chapter 13 before the statutorily prescribed 3 years, was in essence only a payment plan for the attorneys' fees and was therefore not proposed in good faith); *In re Platt*, No. 12-6170, 2012 WL 5842899, at *3 (Bankr. S.D. Ind. Nov. 19, 2012) (finding that while not all "fee only" Chapter 13 plans are per se filed in bad faith, the debtor had not met his heavy burden in demonstrating special circumstances justifying the Chapter 13 petition or plan); *In re Hopper*, 474 B.R. 872, 887 (Bankr. E.D. Ark. 2012) ("Debtor's actions in filing bankruptcy two days before the scheduled contempt action, and in proposing a fee-only plan that paid his creditors virtually nothing evidences a lack of good faith."); *In re Jackson*, Nos. 11-42528-JJR-13, 11-42825-JJR-13, 2012 WL 909782, at *9–10 (Bankr. N.D. Ala. Mar. 16, 2012) (finding that the debtors' best interests are served by seeking relief in Chapter 7, not Chapter 13, because

-18-

outcomes vary and there is limited benefit in further discussing the decisions here. The bottom line is that, in the Tenth Circuit—and in all the Circuit cases just discussed, whether a plan has been proposed in good faith is a question of fact based on the totality of the circumstances.[63]

In *Flygare v. Boulden*,[64] the Tenth Circuit advised bankruptcy courts how to

---

"there is simply no meaningful or legitimate debt adjustment purpose to be found" and therefore the provisions, purpose, and spirit of Chapter 13 were abused); *In re Arlen*, 461 B.R. 550, 555–56 (Bankr. W.D. Mo. 2011) (finding that the debtors failed to file their plan in good faith because the plan was specifically constructed to pay no dividend to unsecured creditors rather than making payments for the entire applicable commitment period and the debtors provided no evidence to rebut the argument that they would be better served by a Chapter 7 discharge); *In re Molina*, 420 B.R. 825, 831–33 (Bankr. D.N.M. 2009) (holding that a debtor who is in "economic straits," "literally doing all that the statute requires of her," ineligible to file for Chapter 7, and compliant with "the letter, and the spirit, of the chapter 13 law as Congress has written it" may file an attorney fee-only Chapter 13 plan); *In re Sanchez*, No. 13-09-10955MA, 2009 WL 2913224, at *1–3 (Bankr. D.N.M. May 19, 2009) (finding a lack of good faith with a plan that pays only attorneys' fees in a case where debtors have a history of incurring "debts they are unable to repay and then seek[ing] bankruptcy protection every few years in order to alleviate their debt burden"); *In re Lehnert*, No. 07-55988, 2009 WL 1163401, at *3–4 (Bankr. E.D. Mich. Jan. 14, 2009) (sustaining an objection to an attorney fee-only plan as not filed in good faith because the debtors were able to afford some dividend to creditors and a zero percent distribution to unsecured creditors did not strike the court as a good faith attempt to repay pre-petition creditors); *In re Montry*, 393 B.R. 695, 696–97 (Bankr. W.D. Mo. 2008) ("Confirming a Chapter 13 plan in a case where the only benefit to a debtor—beyond the relief available in Chapter 7—is the ability to pay the bankruptcy attorney's fees over time would . . . unnecessarily raise the cost of filing a bankruptcy petition for debtors who do not need or are ill suited for Chapter 13; and subverts the Supreme Court's holding in *Lamie v. U.S. Trustee* prohibiting the payment of post-petition attorney's fees from a debtor's Chapter 7 bankruptcy estate."); *In re Paley*, 390 B.R. 53, 59–60 (Bankr. N.D.N.Y. 2008) ("The Debtors are not adjusting anything, much less debt; they are canceling and eliminating the claims of creditors while simply paying their attorneys. Under the theories advanced by the Debtors, carried to an absurd extreme, if they had paid their respective attorneys in full up front, they would have proposed a plan of $0 for zero months and demanded a Chapter 13 discharge. . . . These cases, basically Chapter 7 cases hidden within Chapter 13 petitions, blur the distinction between the chapters into a meaningless haze.").

[63] *Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 (10th Cir. 1993).

[64] 709 F.2d 1344 (10th Cir. 1993).

consider good faith challenges to Chapter 13 plans. The thrust of the inquiry is "whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13," judging "each case on its own facts after considering all the circumstances of the case."[65]

The Court in *Flygare* noted that "an important factor" in this good faith analysis should be "the percentage of payment to unsecured creditors" proposed by the plan, but also held that is only one of many factors courts should consider: "[o]ther factors or exceptional circumstances might exist which would preclude a finding of bad faith even though only a nominal repayment to unsecured creditors is proposed."[66] The Tenth Circuit then expressed the following non-exclusive factors for determining a debtor's good faith under § 1325(a)(3):

> (1) the amount of the proposed payments and the amount of the debtor's surplus;
> (2) the debtor's employment history, ability to earn and likelihood of future increases in income;
> (3) the probable or expected duration of the plan;
> (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
> (5) the extent of preferential treatment between classes of creditors;
> (6) the extent to which secured claims are modified;
> (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;
> (8) the existence of special circumstances such as inordinate medical expenses;
> (9) the frequency with which the debtor has sought relief under the

---

[65] *Id.* at 1347 (internal quotation marks from *United States v. Estus (In re Estus)*, 695 F.2d 311, 316–17 (8th Cir. 1982) omitted).

[66] *Id.* (internal quotation marks from *Estus* omitted).

Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee.[67]

The weight given to each of these factors must vary, depending on the facts and circumstances of each case.[68]

Relevant to the current issues under review, the *Flygare* court stated the following regarding payments to unsecured creditors: "[a] per se minimum payment requirement to unsecured creditors as an element of good faith would infringe on the desired flexibility of Chapter 13 and is unwarranted."[69] In support of this proposition, the Court cited a treatise on bankruptcy, stating that "[t]here is nothing in the statutory language or the legislative history either of the Bankruptcy Act or of the Bankruptcy Code . . . to suggest that 'good faith' was intended to play any role whatever in determining the quantum of payments or dividends to be proposed by the plan."[70]

The continued viability of the *Flygare* factors, although not overruled, has been questioned by subsequent Tenth Circuit cases. In *Anderson v. Cranmer (In re Cranmer)*,[71] the Tenth Circuit noted in a footnote that the Bankruptcy Code has been

---

[67] *Id.* at 1347–48 (internal quotation marks from *Estus* omitted).

[68] *Id.* at 1348.

[69] *Id.* (internal quotation marks from *Estus* omitted)

[70] *Id.* at 1348 n.4 (citing 5 *Collier on Bankruptcy* ¶ 1325.01[c] at 1325-8.5).

[71] 697 F.3d 1314 (10th Cir. 2012).

-21-

amended since *Flygare* was decided to include § 1325(b), and that "[s]ection 1325(b)'s 'ability to pay' criteria subsumes most" of the *Flygare* factors such that the "good faith inquiry now has a more narrow focus."[72] The Tenth Circuit stated in *Cranmer* that bankruptcy courts still need to consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code."[73] When considering the good faith analysis for that case, the *Cranmer* court noted that "[i]t simply was not bad faith for [debtor] to adhere to the provisions of the Bankruptcy Code and, in doing so, obtain a benefit provided by it."[74]

Binding precedent, therefore, requires this Court to look at the totality of the circumstances when faced with the question of a debtor's good faith in proposing a Chapter 13 plan.[75] And while the *Flygare* good faith factors have not been overruled, they have been questioned. As a result, this Court will analyze each case with the all-

---

[72] *Id.* at 1319 n.5 (internal quotations omitted); *see also Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 n.7 (10th Cir. 1993) (noting amendments to the Bankruptcy Code and stating that "the relevant factors to the analysis of good faith" include "whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentations to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code").

[73] *Cranmer*, 697 F.3d at 1319 n.5 (internal quotations omitted).

[74] *Id.* at 1319; *see also Young v. Young (In re Young)*, 237 F.3d 1168, 1177 (10th Cir. 2001) (noting that it is not bad faith to assert rights provided under the Bankruptcy Code).

[75] *Flygare*, 709 F.2d at 1344 (internal quotation marks omitted) (stating that good faith inquiry should judge "each case on its own facts after considering all the circumstances of the case"); *Cranmer*, 697 F.3d at 1319 ("The good faith determination is made on a case-by-case basis considering the totality of the circumstances.").

encompassing totality of the circumstances test, keeping an eye on the *Flygare* factors that are relevant to each case.

### C. Feasibility

The U.S. Trustee has also objected to confirmation of Debtors' plans based on the feasibility of each plan. Among other requirements, § 109(e) of the Bankruptcy Code states that only "an individual with regular income" is eligible to be a debtor under chapter 13 of the Code. Section 101(30) then defines "individual with regular income" as an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title." In addition, § 1325(a)(6) states that a court can only confirm a plan if "the debtor will be able to make all payments under the plan and to comply with the plan."

As above, Debtors also have the burden to demonstrate they have enough regular income to fund a plan.[76] Debtors also have the burden to establish that each of the elements of § 1325(a) are met, including the feasibility requirement of § 1325(a)(6).[77]

To assess feasibility, courts first consider debtors' income: for the Court to make an income determination, "there must be some factual basis for the court to determine the regularity and stability of debtor's income[; i.e., income must be] . . . from sources

---

[76] *In re Hickman*, 104 B.R. 374, 376 (Bankr. D. Colo. 1989).

[77] *In re Jongsma*, 402 B.R. 858, 871 (Bankr. N.D. Ind. 2009).

-23-

which are stable and regular."[78] In addition, "a debtor cannot satisfy the income requirement for Chapter 13 eligibility by mere allegations that there is an income potential which is contingent upon developments that appear unlikely."[79]

Courts must also look at debtors' expenses. Overall, "the bankruptcy court should be satisfied that the debtor has the present as well as the future financial capacity to comply with the terms of the plan. Thus, a plan is not feasible and is not confirmable if a debtor's income will not support the plan's proposed payments."[80]

Again, the Court must carefully parse the facts of each individual case to properly determine feasibility. The Court is more willing to share in debtors' optimism that they will be able to consummate their plan, despite seemingly "slim" budgets and low wages, when they have stable employment, when their wages are subject to a wage withholding order,[81] when they appear sincerely motivated to gain financial security by doing what it takes over the life of the plan, and when the Court can determine that the debtors have at least some basic budgeting skills to enable them to complete their plans. For a plan to be feasible, debtors should also be current in plan payments and

---

[78] *In re Norwood*, No. 12-23027, 2013 WL 4099834, at *8 (Bankr. D. Colo. Aug. 8, 2013) (internal citations omitted).

[79] *Id.*

[80] *In re Buccolo*, 397 B.R. 527, 530 (Bankr. D.N.J. 2008).

[81] Wage withholding orders do not give a debtor the "choice" of who to pay when competing bills arrive each month; the plan payment is simply deducted from their pay and forwarded by the employer to the Standing Trustee. The Standing Trustee also testified that withholding orders reduce the cost of administration for his office, result in fewer motions to dismiss on this Court's docket, and portend higher plan completion rates than cases where debtors must remember to make the payments on their own.

should not have needed to incur postpetition debt at the time of the confirmation hearing, since the budget should be sufficient to allow them to maintain normal monthly living expenses. The Court also considers whether there is some evidence of a change from negative patterns in a debtor's past. And finally, if debtors rely on income other than from employment (e.g., child support, part-time employment, etc.) to meet the "regular income" eligibility standard, that other income must also be regular and stable.

## III.  Analysis

### A.  Ellsperman, Case No. 15-40609

Debtors Michael and Ginger Ellsperman are a young couple with two children who, prior to filing their Chapter 13 petition, had rather methodically developed a five year plan to remedy their financial woes. First, a review of their history, and how they came to be in their present situation. Mr. Ellsperman filed a Chapter 13 case seven years earlier—in 2008, before Ms. Ellsperman came into the picture, but it was dismissed without discharge in 2011.[82] Now married, Mr. and Mrs. Ellsperman were able to meet their financial obligations until the birth of their second child two years ago. They then began having trouble keeping up with their monthly expenses, especially when Mr. Ellsperman, a laborer who installs flooring, missed work due to work-related injuries and incurred medical bills they were unable to pay. The

---

[82]  The prior case is Case No. 08-22027-13. Docket entries in that case show the case began with wage withholding, but it was when Mr. Ellsperman's plan payment became "direct pay," rather than through wage withholding, that he missed the payments that ultimately resulted in the dismissal of his case.

Ellspermans had judgments entered against them, and shortly before consulting a lawyer, a creditor attempted to garnish their bank account. In addition, although they were entitled to some tax refunds, taxing authorities set off those returns due to past due state taxes.

Around this time, Mr. Ellsperman also became the power of attorney for his mother, who suffered mental health problems; she also moved into their home. The couple considered filing for bankruptcy in late 2014 and consulted an attorney, but because they did not have the funds to pay the attorney the very high fees they were quoted for filing a Chapter 7, they decided it was too expensive to file.

In early 2015, the Ellspermans received a large income tax refund of about $8,200. The attorney with whom the Ellspermans consulted in late 2014 had advised them to spend down their refund on necessities to further their ultimate fresh start, and they did so. They used that refund to catch up on delinquent utility payments, buy a larger (used) vehicle, and pay security deposits on and move into a different rental property that was in a safer neighborhood with sidewalks and a fenced yard for their children and included more space for their larger household.[83]

By mid-year 2015, however, the Ellspermans were again in financial trouble. While they were caught up on their utilities and had enough regular income to pay their monthly bills, they were receiving daily calls from old creditors demanding payment. No actual wage garnishments were occurring at this time, however.

---

[83]  They also used a small portion of the refund to buy a wedding band for Ms. Ellsperman, and no one has challenged that purchase as not being in good faith.

At that point the Ellspermans consulted with Housing and Credit Counseling, Inc., a very respected credit counseling provider in the area, and were advised that bankruptcy was their only reasonable option since they had no ability to repay the past due debt. As a result, the Ellspermans decided to consult anew with a different attorney specializing in bankruptcy, and that attorney advised them about the various options available to them.

Ms. Ellsperman testified about her general understanding of the differences between a Chapter 13 and Chapter 7 bankruptcies that she learned from that consultation and from the credit counselor. According to Ms. Ellsperman, they were quoted a fee of $1800 to file a Chapter 7 case, and she understood this would erase their debts and they would receive a discharge within about six months. Regarding Chapter 13, Ms. Ellsperman testified that she understood they would be committed to a three-year repayment plan, and that likely only attorney and trustee fees would be paid with their plan payments. She testified that she understood that their $37,000 in student loans would not be collected during that time, and that interest would continue to accrue.

Ms. Ellsperman also testified that one reason they ultimately chose to seek relief under Chapter 13 stemmed from their concern about potential new medical expenses for Mr. Ellsperman. Mr. Ellsperman provides the main source of income for his family and has very stable employment as a 19-year floor layer. But he also suffers the ill effects of that profession: he has pain in his knees, back, and shoulders, and may need knee surgery in the future. Mr. Ellsperman has a doctor's appointment at the end of

the month to assess the appropriate management of his knee pain.

Ms. Ellsperman, who was a very credible witness and a person very motivated to succeed in the family's Chapter 13, testified that she had developed a five-year financial plan for her family. She and her husband had serious discussions about the differences between Chapter 13 and Chapter 7 and decided that Chapter 13 was their family's better option. The plan is to first complete their bankruptcy in three years, then start addressing the student loan debt and rebuilding their credit so they may eventually achieve the American dream of buying their own home with a low mortgage interest rate. The Ellspermans discussed waiting to file until a future tax refund was received, likely 8 months in the future, but decided it was best to file bankruptcy sooner to get started on their plan.[84]

The Chapter 13 plan proposed by the Ellspermans requires a $100 per month payment. The Ellspermans owe $61,768 in unsecured, non-priority debts, consisting mostly of utilities, medical debt, and student loans of about $37,000. Their plan will pay $3150 to their attorney, the $310 filing fee, and the Trustee's administrative fee, and if their income doesn't appreciably rise over the three year plan, their plan will pay zero to unsecured creditors. The plan payment will be made directly from Mr. Ellsperman's paycheck, and at the confirmation hearing, the Ellspermans' plan payments were current.

---

[84]  The Ellspermans did not discuss assigning a future tax refund to their attorney to pay for a cheaper Chapter 7 bankruptcy, and Ms. Ellsperman testified she was unsure the logistics of doing that or whether that was even possible.

-28-

Since filing, Ms. Ellsperman has obtained part-time employment as a sales clerk, which helps the feasibility of the plan. The Ellspermans filed amended schedules I and J, and these show a monthly combined income of $4103. Of this, Mr. Ellsperman earns $2727, Ms. Ellsperman earns $585, $675 is contributed by Mr. Ellsperman's mother, and the Ellspermans include $116 per month from their yearly tax refund. (The Ellspermans testified that they spent their entire 2015 tax refund prior to filing, however, so it appears this $116 per month should not be included in assessing whether they can make their plan payments until they become entitled to a future year's refund.) The amended schedule J reflects monthly expenses of $3726, leaving a monthly excess of $377 from which the Ellspermans' plan payment would be made. The Ellspermans' monthly expenses may increase when Ms. Ellsperman's employment hours become more stable, because at that point they intend to place their youngest child in part-time preschool classes.

There was also testimony about the possibility that Mr. Ellsperman's mother may move out of the household; if that would happen, her monthly contribution of $675 would be lost. The possibility was purely speculative, however, and Ms. Ellsperman credibly testified that if it were to happen, their expenses would also significantly decrease, and she was unconcerned that she would be unable to balance their budget.

Marilyn Stanley, the chief operating officer of Housing and Credit Counseling, Inc. ("HCCI"), which is located in Topeka, Kansas where these Debtors also reside and which agency is approved by the U.S. Trustee to provide debtor education and pre-bankruptcy planning, testified as an expert witness. Ms. Stanley is a certified credit

-29-

counselor with sixteen years experience at HCCI, and is very familiar with what it reasonably costs to live in Kansas. She testified about the options their clients have when they come to HCCI for credit counseling. For example, a client may be interested in a debt management plan, wherein their debt would be consolidated and a portion repaid over time. HCCI's debt management plans have only a 54% retention rate at thirty six months, however, and a 13% retention rate at sixty months. Ms. Stanley further testified that a debt management plan was not a feasible option for the Ellspermans, because while they could keep their ongoing expenses paid with wages, they had no additional income available to negotiate with creditors holding old debts. Ms. Stanley determined that the Ellspermans simply had no other option but bankruptcy: they could not borrow the funds to repay their debt and had no assets to reasonably pledge to acquire money to repay that debt.

Ms. Stanley then reviewed the Ellsperman's amended schedule I and J to determine if their plan payment was feasible. Ms. Stanley noted areas where their expenses could be reduced if it became necessary (e.g., phone and internet expenses of $198 and $86 per month, and personal grooming of $160 per month), and determined that even if child care costs increased, the Ellspermans' budget appeared sound and they would be able to make their $100 per month plan payment. Ms. Stanley also testified that she believed the Ellspermans would be able to complete their Chapter 13 plan, citing that they are motivated, have goals in place, have the options in their budget to make their plan work, and are knowledgeable debtors.

Finally, Ms. Stanley testified about the garnishment process in this jurisdiction.

She testified that a garnishment, which can attach 25% of a person's wages,[85] will typically start within a couple months of a judgment being taken. A garnishment can also attach 100% of a person's bank account.[86] Finally, Ms. Stanley testified that if any creditor elected to start garnishing, such garnishment would make it very difficult to save for a Chapter 7, which on average in this area costs between $1500 to $3500 in attorney fees.

Tim Owen, the chief financial officer for Jan Hamilton, the Standing Chapter 13 Trustee in this Division, next testified about certain statistics he compiles for that office, including the percentage of cases closed as complete each year in this Division since 1999. For example, in 2015, the completion rate for Chapter 13 cases in this Division is 65.19%, compared to a national average of only 44.97%. Mr. Hamilton also testified, stating that there is no way for his office to recognize a fee-only case without looking at the individual plan in the case, and that his office treats fee only cases the same as any other in their case handling system. This testimony rebutted the U.S. Trustee's suggestion that those cases are administratively burdensome.

The U.S. Trustee objected to confirmation of the Ellspermans' plan, as he did to all the cases currently under review, arguing that their plan was not proposed in good faith under § 1325(a)(3), that they did not file their petition in good faith under §

---

[85] *See* K.S.A. § 60-2310 (Kansas wage garnishment statute, which allows garnishment of 25% of aggregate disposable income).

[86] *See* K.S.A. § 60-733 (Kansas statute governing garnishment of funds held by financial institutions).

1325(a)(7), and that their plan was not feasible under § 1325(a)(6).[87] The U.S. Trustee also moved to convert the Ellspermans' case to Chapter 7 based on the same arguments.[88] The Standing Trustee also objected to confirmation and moved to dismiss, making the same arguments.[89]

The Court first assesses this case for good faith. While Mr. Ellsperman does have one prior, dismissed bankruptcy case, the circumstances of that case are sufficiently different from the present circumstances that the Court does not count this factor against him. Mr. Ellsperman's current case is filed jointly with his wife, and plan payments will be made by wage withholding (compared to Mr. Ellsperman making direct payments at the time his previous case was dismissed), so the likelihood of success for the current case is higher. Mr. Ellsperman has had the same employment for nineteen years, meaning his employment and income are very stable and there is no reason to think his employment and earnings will not continue throughout his plan.

There are no inaccuracies in the Ellspermans' schedules or listings of debt, and no preferential treatment of particular creditors. The Ellspermans do not have any debts they are seeking to discharge in their Chapter 13 case that would not be dischargeable under Chapter 7 and do not owe debts to any secured or priority creditors that they wish to modify under their Chapter 13 plan. Prior to trial, to reflect the most accurate and up-to-date information regarding their income and expenses, the

---

[87] Case No. 15-40609, Doc. 23.

[88] Case No. 15-40609, Doc. 25.

[89] Case No. 15-40609, Docs. 19 and 20.

Ellspermans amended schedules I and J. Their budget appears healthy to the Court, and Marilyn Stanley, who is an expert in the field of credit counseling and debt management, so testified. The Ellspermans do not have a lavish lifestyle; they are living modestly and making do with what they have.

Admittedly, at this point in their 3 year plan, there is no payment expected for the Ellspermans' unsecured creditors. But this is just one factor in the Court's totality of the circumstances analysis. The Ellspermans are the definition of motivated debtors: Ms. Ellsperman credibly testified at length about her five-year financial plan. The Ellspermans want to gain financial stability, they want to complete their bankruptcy in three years, and they want to then address their student loan debt. They have a sincere desire to clear their credit and save money to buy a home. Chapter 13 was a choice they made, with the advice of counsel, to help further this plan.

The Ellspermans also fully recognize that Mr. Ellsperman may have future medical expenses, and filing a Chapter 13 case (instead of a Chapter 7, had they been able to afford it) gives them more options for dealing with that potential debt later.[90] The Standing Trustee will not treat the Ellspermans case any differently than any other case, and there is no evidence suggesting that the fact that this is a fee only case will itself produce any additional burden on the system.

---

[90] One option would be to convert to a Chapter 7 if they incur medical debts that are not covered by health insurance and that they are unable to pay. Because such a conversion would likely be held to be in good faith, the debts that accrued between the date of filing and conversion would be included in any discharge. *See* § 1307(a) (permitting conversion of Chapter 13 case to Chapter 7 by a debtor "at any time"); *Nady v. DeFrantz (In re DeFrantz)*, 454 B.R. 108, 114 (9th Cir. 2011) (discussing bankruptcy court's authority to consider a debtor's good faith in converting his case from Chapter 13 to Chapter 7).

As discussed above, good faith is an amorphous concept. There is no doubt that the Ellspermans needed bankruptcy relief; the U.S. Trustee agrees. The Ellspermans had been treading water with their debt since the birth of their second child, they had judgments against them and prior set offs, and they were receiving daily calls from creditors. Based on Ms. Stanley's testimony, garnishments would likely follow, and garnishments would have further impaired this family's ability to get a fresh start (and would have resulted in preferring one unsecured creditor over others).

The Ellspermans chose Chapter 13 bankruptcy after receiving advice of competent bankruptcy counsel. They chose it because they could not afford the up front attorney's fee for a Chapter 7 case and had no way to borrow it, but they also chose it because of their substantial student loans,[91] because of their future potential medical expenses,[92] and because of the way it fit into their five-year plan. And the evidence shows that the Ellspermans made a good choice: this Division enjoys a relatively high Chapter 13 plan completion rate, the comparable retention rate for debt management plans outside of bankruptcy is well below this average, and Ms. Stanley testified it would have been impossible for the Ellspermans to save the funds for a Chapter 7, due

---

[91] *See In re Harding*, 423 B.R. 568, 578 (Bankr. S.D. Fla. 2010) (discussing the treatment of student loans in Chapter 13 bankruptcy cases, noting that student loans are nondischargeable under § 1328(a)(2), that student loans "will continue to accrue regular nondischargeable interest throughout the life of the Debtor's Chapter 13 Plan," and that the student loan creditor was prohibited from assessing penalties during the Chapter 13 case because of the automatic stay).

[92] *See In re Crager*, 691 F.3d 671, 675 (5th Cir. 2012) (discussing bankruptcy court's finding of the debtor's "legitimate fear that a future medical problem might leave [the debtor] in a situation in which she had to take on more debt and might need to file another Chapter 13 petition").

to impending garnishments and the devastating impact garnishments have on a household budget.

The Ellspermans have met the statutory requirements for a Chapter 13 case, and there is no evidence with which this Court could question their good faith in making the choice for Chapter 13. Based on the totality of the circumstances, the Court cannot and does not find a lack of good faith here. Nothing in the Code required the Ellspermans to continue to suffer daily collection calls, and even the U.S. Trustee agrees the Ellspermans did nothing wrong except to choose Chapter 13, for which relief they are indisputably eligible.

The Ellspermans have also met their burden to show the feasibility of their plan. Mr. Ellsperman's income is regular and stable, and Ms. Ellsperman has recently begun working part-time to supplement the household budget. In addition, Mr. Ellsperman's mother contributes to household expenses.[93] Even if their amortized tax refund is not included in their monthly income, they have $3987 available each month to meet current expenses of $3726 plus a $100 plan payment. Although there was testimony

---

[93] Contributions of relatives can be considered in the feasibility analysis if there is some assurance that the contributions will continue. *Compare In re Heck*, 355 B.R. 813, 824–25 (Bankr. D. Kan. 2006) (declining to find "regular income" and a feasible plan when debtor's success depended on financing from her boyfriend and there was no evidence of his ability and obligation to continue the support) *with In re Baird*, 228 B.R. 324, 329 (Bankr. M.D. Fla. 1999) (considering "payments due purely to the generosity of a close relative" to be "stable and regular income" and reasoning that they are analogous to welfare payments). Here, there was testimony that Mr. Ellsperman's mother may, at some point, move to California and cease contributing to the Ellspermans' household. But this future possibility was pure speculation. Ms. Ellsperman testified that if she were to stop contributing, the household expenses would decrease as well, and both she and Ms. Stanley testified that there were options to make the budget work.

Case 15-40644    Doc# 96    Filed 12/17/15    Page 35 of 107

that the Ellspermans' expenses may increase if their youngest child is placed in part-time preschool, both Ms. Ellsperman and Marilyn Stanley testified that there were line items in the budget that could reasonably be reduced to accommodate any difference, and Ms. Ellsperman testified she might be able to work more than her present part-time hours. The Ellspermans' plan payment of $100 per month is feasible.

The U.S. Trustee's objection to confirmation[94] of the Ellsperman's plan is overruled and his motion to convert[95] is denied. The Standing Trustee's objection to confirmation and motion to dismiss[96] are also denied. The Court sets the case for confirmation on January 27, 2016.

**B.    Wark, Case No. 15-40558-13**

Debtor Rhonda Wark suffers from hyperthyroidism and chronic obstructive pulmonary disease but, due to the poor state of her finances, often elected not to seek needed medical treatment prior to filing her bankruptcy because of her concern how she would pay for that treatment. Although she was working, Ms. Wark was garnished by her medical creditors almost the entire length of her employment, thus making it difficult to keep her monthly expenses current. Immediately prior to filing her petition, Ms. Wark also lost part of her wages from a garnishment by yet another creditor (from an ancient student loan debt). Knowing she needed to see her doctors but realizing she could not afford to pay for doctor's visits or health insurance due to these

---

[94]  Case No. 15-40609, Doc. 23.

[95]  Case No. 15-40609, Doc. 25.

[96]  Case No. 15-40609, Docs. 19 and 20.

garnishments, Ms. Wark sought the relief offered under the Bankruptcy Code.

Ms. Wark began working for Walmart in August 2014. Within two months, by October, her wages were being garnished by one of her medical creditors. At this time, Ms. Wark began to fall behind on her regular monthly bills. In addition, because Ms. Wark could not afford health insurance on her own and was not yet eligible to receive subsidized insurance through work, the bills for her medical treatment began to stack up.

Ms. Wark was entitled to a tax refund of between $400 and $500 in 2014, but it was intercepted by her student loan creditor. By April 2015, Ms. Wark was just squeaking by, and knew she would not be able to pay for her regular doctor visits in the future. In May, Ms. Wark's student loan creditor began garnishing her wages based on a ten year old debt of $1657. Ms. Wark elected to file her Chapter 13 bankruptcy after seeing the reduction in her paycheck caused by the garnishment from that creditor. Due to her garnishments and the need for medical care, Ms. Wark was unable to save the money that would be needed to pay the up front fee to an attorney to represent her in filing a Chapter 7. She had no one from whom she could borrow the funds, and she did not believe she had the ability to file bankruptcy without the help of counsel.

After watching a video about the benefits and drawbacks of both Chapter 7 and Chapter 13, and discussing her options with experienced counsel, Ms. Wark decided she would most benefit from a Chapter 13 bankruptcy. Ms. Wark understood that, under Chapter 13, she would continue to be protected from collection efforts by her student loan creditor and would have more flexibility to handle her future medical

-37-

costs. Indeed, Ms. Wark has already incurred post-petition medical debt due to her illnesses.

The vast majority of Ms. Wark's debts are medical bills, with an assortment of other consumer debts including her student loan. In total, Ms. Wark owes about $11,785 to her unsecured creditors. Ms. Wark does not have secured or priority creditors as she owns no substantial personal or real property nor does she owe back taxes. Ms. Wark anticipates a tax refund for 2015, but cannot estimate its value.

Ms. Wark earns approximately $1171 a month from Walmart. Since filing, Ms. Wark has received a raise from $8.15 to $9.25 an hour. Ms. Wark testified that her raise was due to her one year employment anniversary, and she anticipates she will receive another raise in the future. At the time of filing, Ms. Wark was not eligible for health insurance through work, but testified at trial that she now receives health insurance through her employment that carries a $2000 yearly deductible. Ms. Wark was not able to tell the Court exactly what amount is deducted from her wages, but thought it to be around $40 a month.

Ms. Wark completed her schedule J (expenses) after reviewing her monthly receipts and bills. She pays $320 a month in rent; $205 for utilities; $215 for food and housekeeping supplies; $245 for clothing, personal care products, and entertainment; and $25 for a monthly bus pass to get to work. Ms. Wark only budgets $50 a month for medical costs, however, which are on the low end for her circumstances, but she testified she is able to get some free care. At the end of the month, Ms. Wark is left with $111 and reported at trial that she is current on all bills.

Ms. Wark's plan proposes to pay $90 a month for 36 months totaling $3240 for the estate. She proposes to pay her attorney $2500 for his fees and closing costs, $310 to the Court in filing fees, and the remainder to the Standing Trustee for administering her estate. Ms. Wark's plan as proposed will pay nothing to her unsecured creditors. Her plan payments come directly out of her check through an employer withholding order and she was $13 ahead on her payments at the time of trial.

Ms. Wark has filed bankruptcy once before, roughly 30 years ago. According to testimony at her deposition, her then husband filed a joint bankruptcy for them in order to manage his business affairs. She did not recall any other details of the case.

The Court heard testimony from Paul Post, an experienced Topeka area bankruptcy attorney.[97] Practicing since 1974, Mr. Post recounted his experience with debtors such as Ms. Wark and how changes in the bankruptcy laws since 1978 have made it increasingly more complicated and more expensive for both attorneys and debtors to navigate a bankruptcy case.

Ms. Post testified that he has filed what he considers "fee only" cases in the past. In his experience, some cases that start out as "fee only" may not end that way due to a new source of income discovered over the course of a plan (e.g., tax refunds, inheritance, workers compensation, personal injury recoveries, per capita payments from tribes, funds that become available for unsecured creditors when a secured

---

[97] The Court notes that Mr. Post did not represent any of the Debtors involved in these ten cases.

claimant fails to file a claim, etc.).[98]

Mr. Post also testified about the practices of Topeka area collections agencies. While Mr. Post discussed the practices of these agencies in great detail, the important points are as follows: collections agencies in Topeka and the processes that are used are overwhelming to attorneys representing debtors and to debtors alike, the processes used are very unfriendly to debtors, requiring debtors to take off work to go to multiple "cattle call" hearings a year, and the agencies in particular are extremely aggressive. He noted that because of liberal garnishment laws in Kansas, collectors are typically unwilling to negotiate a compromise payment less than can be received via garnishments. Therefore, the collection practices and procedures in Topeka make it very difficult—if not impossible—for low income debtors already threatened with judgments and garnishments to save any money to pay counsel to represent them in a Chapter 7 bankruptcy.

Mr. Post also discussed payment options he considers when clients cannot afford the up front costs of his representation in a Chapter 7.[99] This testimony was in response to the overall implication from the U.S. Trustee's position that myriad

---

[98] By way of example, this Court very recently signed an order in *In re Sachs*, No. 14-41041, Doc. 40, sustaining the Standing Trustee's motion to modify a Chapter 13 plan to pay all of debtor's claims in full after debtor received life insurance proceeds in an amount sufficient to pay all allowed unsecured claims (over $65,000). The Court acknowledges that this scenario is not common, but a Chapter 13 case that does not appear to provide for unsecured creditors can, and sometimes does, pay money to creditors in unexpected ways. In this scenario, the Chapter 13 option would obviously be far better for creditors than a no-asset Chapter 7 case.

[99] Mr. Post testified that he usually charges $1500 up front for a Chapter 7 case but understands this amount to be "on the low end" in the Topeka area.

Case 15-40644   Doc# 96   Filed 12/17/15   Page 40 of 107

attorneys are readily available to file Chapter 7 cases for low income debtors who would have difficulty paying an up front attorney's fee. First, Mr. Post does occasionally agree to take an assignment of a potential tax refund to pay part of his fee, but does so only in conjunction with a down payment of $1000 plus prepayment of the filing fee since doing otherwise is too risky.[100]

Secondly, while Mr. Post has heard of attorneys taking liens on personal property in exchange for representation, he has never spoken to someone who commonly uses the practice. Mr. Post has only once in his 30+ years of practice taken a lien on personal property to ensure payment of his fees and testified that he would not care to do it again. Mr. Post also stated that pro se debtors tend to spend more money hiring a lawyer to fix their filings than they would have spent on representation from the start of a case.

The Court next heard testimony from the Standing Chapter 13 Trustee in

---

[100] Tax assignments for the payment of fees are certainly an option this Court has seen debtors use to pay attorneys. But this process is itself a gamble. For example, the Court notes a recent case, No. 14-40844, *Cain*. In the *Cain* case, the debtor in July 2014 assigned her future tax refund to her attorney for the payment of attorney's fees for her Chapter 7 case. (Doc. 4, assignment of income tax refund for 2014 tax year.) It was not until December 2015 that the Court signed an order actually effectuating that payment. (Doc. 38, Order Granting Trustee's Motion for Authority to Allocate Federal Tax Refund and Disburse Funds to Debtor's Counsel.) In other words, debtor's counsel in the *Cain* case did not get paid from the assignment (taken at the beginning of the case) until nearly seventeen months after completing the work. And had that debtor not been entitled to receive a refund, or had the refund been offset for past due child support or other tax obligations, or if the taxing authorities had refunded the money directly to the debtor (and not to the Chapter 7 Trustee, who recognizes such assignments) and the debtor had not in turn used it to repay the debt to the attorney, the attorney might never have been paid for the valuable services provided. These risks explain why more attorneys elect not to go this route to secure payment.

Case 15-40644    Doc# 96    Filed 12/17/15    Page 41 of 107

Topeka, Jan Hamilton. Mr. Hamilton testified that his office cannot distinguish, purely by the numbers, a fee only case from any other case that travels through his office. As a result, he cannot say that a fee only case causes any more (or less) administrative work than other Chapter 13 cases. Again, this testimony was in response to the inference made by the U.S. Trustee that these cases are administratively burdensome. Mr. Hamilton also testified that employer pay cases greatly increase the probability that a plan will be completed successfully and that pro se cases create the most administrative work for his office by far—repeatedly calling pro se cases a "nightmare." This testimony was elicited to respond to the U.S. Trustee's suggestion that instead of filing her Chapter 13 cases with the assistance of experienced counsel, Ms. Wark might have opted to file a case without representation. This, of course, is not only a really bad idea for debtors generally, but it places a substantial burden on the Court, on its Clerk's Office staff, and on the Standing Trustee and his staff.[101]

Mr. Hamilton also noted that in addition to the significantly higher administrative burdens pro se cases create for his office, they are rarely successful. Finally, Mr. Hamilton testified that when he reviews a case for feasibility, a large factor in determining whether a case, budget, or plan is feasible is the debtor's commitment to the process—something a cursory look at the numbers cannot disclose.

---

[101] Courts are allocated Clerk's Office staff based on enumerable factors, but one of the factors is the amount of time it takes to process different kinds of cases. For Chapter 12 and 13 filings, the average credit hours per filing is 3.63 for non pro se cases and 5.95 for pro se cases. In other words, the formula recognizes a 64% higher credit per filing when the filer is self represented because it takes 64% more staff time to process these cases. These figures, collected by the Administrative Office of U.S. Courts, come from time records kept by Clerk's Office staff when the formula was derived.

He also noted that the mere fact that a debtor has a more robust budget does not always correlate to a successfully completed plan—a point affirmed by Mr. Post.

The U.S. Trustee also objected to confirmation of Ms. Wark's plan, arguing that her plan was not proposed in good faith under § 1325(a)(3), that her petition was not filed in good faith under § 1325(a)(7), and that her plan was not feasible under § 1325(a)(6).[102] The U.S. Trustee also moved to convert Ms. Wark's case to Chapter 7 based on the same arguments.[103]

The Court first assesses this case for good faith and finds that under the totality of the circumstances, Ms. Wark filed her petition and plan in good faith. While Ms. Wark did file a previous bankruptcy 30 years earlier, due to the large time gap between filings, the Court does not give any weight to this factor. With the exception of her health insurance payment and hourly wage increase, which occurred post petition, the schedules appear accurate, and the U.S. Trustee does not suggest otherwise. Ms. Wark does not have any debts that would not be dischargeable under Chapter 7 and does not owe debts to any secured or priority creditors that she wishes to modify under her plan.

Ms. Wark filed her bankruptcy under Chapter 13 with her eyes open. After receiving advice from counsel, she knew she was eligible to file a Chapter 7 case but chose instead to file her case under Chapter 13 with the understanding that it would (1) protect her from garnishment by her student loan creditor for the pendency of her

---

[102]  Case No. 15-40558, Doc. 16.

[103]  Case No. 15-40558, Doc. 17.

case; and (2) allow her more flexibility to deal with her ongoing health issues and doctor bills. Ms. Wark knew that she could not successfully complete a bankruptcy without representation and did not have the ability to save (or borrow) for that representation. Even if Ms. Wark had personal property or a sizeable tax refund to offer as security—which she did not, it is not certain that she would have found counsel willing to accept it as payment.[104]

Her ongoing medical conditions coupled with up to two garnishments on her paycheck left Ms. Wark with an unenviable choice to make every month—whether to pay for food or pay to see a doctor. Rather than continue having to make the choice of which basic necessity to cover, she elected to seek relief under the Code. Ms. Wark has followed all requirements required by the statute and continues to make her required plan payments.

The Standing Trustee testified that the fee only nature of this case does not per se create more administrative work for his office than any other kind of Chapter 13 case. The Court does not find any evidence that Ms. Wark's filing of her petition or plan were an attempt to abuse the provisions, purpose, or spirit of Chapter 13 and again, the U.S. Trustee agreed in all of these cases that each Debtor needed bankruptcy relief and had done anything wrong. Although her unsecured creditors may receive nothing under her plan as proposed, the Court does not find this treatment unfair or

---

[104] Although not his burden, the U.S. Trustee certainly never offered such evidence or the evidence that there are attorneys routinely filing cases pro bono. And this Court almost never sees petitions being filed by legal aide agencies, and is unaware of any law school sponsored pro bono bankruptcy filers in the District.

inequitable under the circumstances, as those creditors would have received the same under Chapter 7. In fact, any improvement in Ms. Wark's finances could mean her unsecured creditors might receive a dividend to which they otherwise would not have been entitled. Ms. Wark, pressured by the financial and emotional stress of wage garnishments and her medical conditions, made an honest and informed decision to devote her next three years' wages to obtain relief under the Code. Under the totality of the circumstances, the Court finds that Ms. Wark's case meets the requirement of good faith.

The Court next turns to the issue of feasibility and finds that Ms. Wark's plan and associated budget are feasible. The evidence showed Ms. Wark's income is consistent and stable, and her employment appears stable as she plans to remain in her current position. Ms. Wark recently received a raise and credibly testified that she believes she will receive another one in the near future. Ms. Wark thus satisfies § 109(e)'s requirement that Chapter 13 filers have "regular income."

In addition, Ms. Wark's expenses are reasonable for a single person household in the Topeka area. Ms. Wark testified at her deposition that she created her budget based on a review of her receipts and has stayed current on her living expenses since filing. While she does have a slight decrease in her take-home pay due to her health insurance, Ms. Wark has also received an hourly wage increase and has enough flexibility in her budget to adjust if necessary. Ms. Wark's newly obtained health insurance weighs heavily in favor of finding feasibility, as much of her debt consists of medical bills, and the addition of health insurance makes it more likely that Ms. Wark

-45-

can stay on top of her medical conditions.

Ms. Wark makes her plan payments through an employer pay order, which the Standing Trustee testified increases the likelihood that she will be successful in completing her plan. Additionally, Ms. Wark has the sincere motivation to maintain her budget and commit to her plan, a factor that can make all the difference in a plan's success. The Court finds Ms. Wark credible and her budget reasonable in light of all the facts, and therefore finds that her plan as proposed is feasible and satisfies the requirement of § 1325(a)(6).

One more note. The U.S. Trustee's position in this case would doom Ms. Wark to living her foreseeable future in poverty, and perhaps even in unnecessary ill health. Because she could not afford to pay a lawyer to file a Chapter 7, and because she does not have the education or wherewithal to file her own case, the U.S. Trustee's position is that she must instead simply forgo receiving any bankruptcy relief until she can afford the requisite attorney fee. But because her already very low wages were being garnished every month, she couldn't even afford health insurance (let alone save money for an eventual filing), and that caused her to both avoid going to the doctor to receive necessary preventive care, and to incur additional medical bills when she had a health emergency. The U.S. Trustee's position, if adopted, would mire similar debtors in a cycle of poverty. And for what purpose? This Court cannot fathom that purpose given that Ms. Wark is indisputably eligible to file under Chapter 13, has "done nothing wrong" and "needs relief," as the U.S. Trustee readily admits, and has done all the Code requires her to do.

-46-

Accordingly, the U.S. Trustee's objection to confirmation[105] is overruled and his motion to convert[106] is denied. The Court sets this case for confirmation on January 27, 2016.

### C.    Parker, Case No. 15-40655

Debtor Rachel Ann Parker is young, only a few years out of college, and already saddled with seemingly insurmountable debt. A large portion of that debt—more than $70,000—is comprised of student loans that the Code makes difficult to discharge.

Ms. Parker lives in a small town in Kansas, with apparently limited employment opportunities. At the time of filing, Ms. Parker had worked as a nurse's aide at the local hospital for three and a half years, and reported income of $1466 per month, which included some overtime work. She now works full-time at the local hospital, and because the overtime she was accustomed to receiving at filing has ended, she also works about sixteen hours per week at a local hotel. Despite the loss of overtime, with the addition of her part-time job, Ms. Parker testified that her monthly income is about the same as it was at filing. She is thus working very hard, but not getting ahead financially.

Ms. Parker's expenses are tight: she reports total monthly expenses of $1393, so there is little remaining in her budget each month. But Ms. Parker is used to living within these limited means. For example, her monthly rent of $368 includes an

---

[105]  Case No. 15-40558, Doc. 16.

[106]  Case No. 15-40558, Doc. 17.

electricity and water allowance. Any overage of that electricity amount must be paid by her directly, and when this happens, she cuts back on other expenses so she can pay the overage.[107] Ms. Parker's food budget is also very low, at $150 per month, but she is able to eat for free at her grandmother's house several times a week and that reduces her costs. She budgets zero dollars each month for entertainment, although she budgets $250 per month for cable and internet.

Ms. Parker ultimately filed for bankruptcy due to harassing collection calls from her creditors. Although she had no garnishments at the time of filing, her creditors were threatening lawsuits and trying to collect from her. Ms. Parker was anxious about her student loan debt, and what would happen if the student loan creditors aggressively sought repayment. Ms. Parker takes medication to control anxiety, and her debt load was negatively impacting this medical issue.

Ms. Parker also testified that she filed for bankruptcy because her estranged parents were threatening to sue her. Ms. Parker's parents had, unbeknownst to her, kept a list of all the funds they had given her while she was in college from 2008 through 2012—down to the cost of a pair of shoes. In March 2015, their attorney sent her a demand letter for $10,474, seeking $200 per month repayment. Ms. Parker disputes that she owed her parents this money and indicated she did not have the

---

[107]  For example, Ms. Parker budgets $150 for medical expenses. Ms. Parker has ongoing medical issues; she has had anxiety and depression for years, and relies on medicine to keep her symptoms under control. Fortunately, Ms. Parker has medical insurance through her employment. Her monthly prescription costs are $75, and she has a $25 co-payment for a doctor's office visit a couple of times a year. As a result, many months her medical expenses are not as high as budgeted.

money to repay them even if she did owe it.

As of the time she filed her petition in June 2015, Ms. Parker's parents had not yet sued her for the alleged debt, but Ms. Parker has limited other family support, aside from her grandmother. She no longer has a relationship with her parents or brothers. Ms. Parker does have a relationship with one aunt, but this aunt cannot help her financially because she is also in bankruptcy. As a result, Ms. Parker could not borrow the money needed to pay attorney's fees for filing a Chapter 7 bankruptcy petition.

Ms. Parker also has no assets to sell or offer for a lien to raise funds to pay fees. She does have a vehicle—a 2008 Pontiac Grand Prix in good condition, but it was purchased with a down payment from her grandmother and a loan from Farmers State Bank on which her grandmother co-signed. Ms. Parker wants to protect her co-signor grandmother on this secured debt. The vehicle is worth about $8750; Ms. Parker still owes $6074 and she is current on her monthly payments. Other than this secured debt, Ms. Parker's debt consists of payday loans, bad check charges, medical bills, and the above-mentioned family debt and student loans, for a total of $91,352 in unsecured, non-priority debts. Ms. Parker also has one small unsecured priority debt of approximately $230 to the Internal Revenue Service, which means that any tax refund to which she might be entitled could be offset—removing the illusory pot of gold that the U.S. Trustee suggests all these Debtors should use to pay for a Chapter 7 attorney. Finally, Ms. Parker has no prior bankruptcy cases.

Ms. Parker testified that she considered a Chapter 7 bankruptcy, and one reason

she did not choose that option was she could not afford the up front cost of an attorney. She credibly testified she could neither save up or borrow the money for a Chapter 7. Ms. Parker testified about her understanding of the differences between Chapter 13 and Chapter 7, especially in relation to her student loans. If Ms. Parker filed for Chapter 7 relief, she could discharge her non-student loan debt and start over, but her student loan creditors could then immediately start collection attempts again. In a Chapter 13, Ms. Parker's student loan debts will be held at bay while she is within her plan. Ms. Parker was in default on her student loans at the time of filing, and her goal is to get in good standing with the student loans so she can qualify for the income based repayment plan. Since filing, Ms. Parker has made a couple of payments in an effort to get in good standing, but apparently has not consistently done so.

Ms. Parker also testified that she hopes, towards the end of her Chapter 13 case, to file an adversary proceeding seeking to demonstrate that repayment of these student loans would constitute an undue hardship if her employment and health situations do not improve.[108] Ms. Parker credibly testified that she had a sincere desire to have her Chapter 13 plan succeed so she can get a fresh start, and so she will be in a better position to deal with her student loans.

Ms. Parker's proposed plan will require a $73 per month payment for 49 months. Her plan will pay $2948 in attorney's fees, the Trustee's administrative fee, and $232 to the IRS. (Ms. Parker's debt on her 2008 Pontiac will be paid directly, at $199 per

---

[108] *See* § 523(a)(8) (generally excluding educational loans from discharge, unless doing so creates "an undue hardship on the debtor and the debtor's dependents").

month.) As proposed, Ms. Parker's plan will pay zero to her unsecured creditors. Ms. Parker makes her plan payment via wage withholding from her employer. Her account shows a delinquency of $89, but the employer has withheld the funds to provide to the Standing Trustee, and the parties stipulated that Ms. Parker is thus effectively current. Ms. Parker also testified that she is current on all her monthly bills since filing, and that she has acquired no new debt.

Tim Owen, the chief financial officer for Jan Hamilton, the Standing Chapter 13 Trustee in this Division, also testified in this case about certain statistics he prepared. Mr. Owen noted the national average completion rate for Chapter 13 cases of 44.97% in 2015, compared to the completion rate for Chapter 13 cases in this Division of 65.19%. Mr. Hamilton then testified that fee only cases cause no additional time or burden for his office compared with other cases, and that he would not be able to identify fee-only cases without looking at individual plans. Again, this is in response to the U.S. Trustee argument inferring these cases to be administratively burdensome. To compare, Mr. Hamilton testified that pro se cases require significantly more administrative time for his office, and that pro se Chapter 13 cases are rarely successful.

The U.S. Trustee also objected to confirmation of Ms. Parker's plan, arguing that the plan was not proposed in good faith under § 1325(a)(3), that the petition was not filed in good faith under § 1325(a)(7), and that Ms. Parker's plan was not feasible

-51-

Case 15-40644   Doc# 96   Filed 12/17/15   Page 51 of 107

under § 1325(a)(6).[109] The U.S. Trustee also moved to convert Ms. Parker's case to Chapter 7 based on the same arguments.[110]

The good faith analysis, as consistently done throughout, encompasses the totality of the circumstances surrounding Ms. Parker's case. There are no inaccuracies in Ms. Parker's schedules[111] or listings of debt, and no preferential treatment of particular creditors. Ms. Parker does not have any debts she is seeking to discharge in her Chapter 13 case that would not be dischargeable under Chapter 7 and does not owe debts to any secured or priority creditors that she is proposing to modify in her plan. Ms. Parker has no prior bankruptcy cases, her income has been steady and regular for the last three years, and when the overtime connected with her full-time job decreased, she voluntarily started a part-time job to supplement that income. This is not the picture of a person trying to game the bankruptcy system, and again, the U.S. Trustee admits she has done nothing wrong other than to elect to proceed under Chapter 13.

Rather, Ms. Parker is in need of bankruptcy protection—another fact the U.S. Trustee readily admits. Like many Americans,[112] Ms. Parker is saddled with very high

---

[109] Case No. 15-40655, Doc. 20.

[110] Case No. 15-40655, Doc. 21.

[111] Part of Ms. Parker's income has changed from overtime to her part-time employment, but Ms. Parker testified that her total monthly income remains about the same.

[112] *See* Meta Brown et al., *Student Debt Growth and the Repayment Progress of Recent Cohorts*, 23 Am. Bankr. Inst. L. Rev. 331, 333 (Winter 2015) (describing the growth of student loan debt in the United States—it has "tripled, from $364 billion in 2004 to $1.08 trillion in 2013"—and the repayment progress on that debt).

student loans compared to her earning potential. She has payday loans and old medical bills, and her parents had recently started attempting to collect on the support they gave her while in college.

In short, Ms. Parker needs the relief of the bankruptcy system. She suffers anxiety, and is worried about the collection activities of her creditors. Like all the Debtors herein, Ms. Parker credibly testified she could not afford the up front attorney's fee to file a Chapter 7 case, and she had no reasonable chance of acquiring those funds. She had no family or friends from whom she could borrow the money, received no large income tax refund that she could have used to pay for an attorney (if she wanted to wait 8 or 9 months, before the next cycle of refunds might be received), and had no unencumbered assets to pledge for repayment of such fee.

Although the U.S. Trustee opines Chapter 7 is a better option for Ms. Parker, the fact is that Chapter 13 is a reasonable and statutorily available option for Ms. Parker, and she chose it based on her circumstances and on advice of counsel. She will benefit from a three-year respite from the collection efforts of her student loan creditors,[113] and she will be able to discharge significant other debt that is troubling her. And during the time she is within her plan, she can work to bring herself out of default on those student loans, so that she can qualify for the income based repayment

---

[113] *See In re Harding*, 423 B.R. 568, 578 (Bankr. S.D. Fla. 2010) (discussing the treatment of student loans in Chapter 13 bankruptcy cases, noting that student loans are nondischargeable under § 1328(a)(2), that student loans "will continue to accrue regular nondischargeable interest throughout the life of the Debtor's Chapter 13 Plan," and that the student loan creditor was prohibited from assessing penalties during the Chapter 13 case because of the automatic stay).

program.[114] She can also then pursue a discharge of the student loans based on an undue hardship, if circumstances then existing justify it.

Absent some change in her circumstances, Ms. Parker's unsecured creditors will receive no distribution in this plan as proposed.[115] But the Standing Trustee will expend no additional effort in Ms. Parker's case just because it is proposed as fee only; on the other hand, he would expend significantly more effort if Ms. Parker had opted to go it alone and file her Chapter 13 case pro se as the U.S. Trustee seems to suggest is a viable option for these Debtors. A zero distribution to unsecured creditors does not alone mean Ms. Parker's plan was not filed in good faith. The balance of factors shows that Ms. Parker has not "unfairly manipulated the Bankruptcy Code."[116] Ms. Parker has carried her burden to show that her plan "was proposed in good faith and not by any means forbidden by law."[117]

Ms. Parker has also met her burden to show the feasibility of her plan. Ms. Parker's income has been regular and stable for the last several years. Her monthly income is about the same as it was at filing, at $1466 per month. Admittedly, this is

_____

[114] *See Abney v. U.S. Dep't of Educ. (In re Abney)*, No. 15-60501, 2015 WL 6962925, at *4–5 (Bankr. W.D. Mo. Nov. 10, 2015) (describing the Department of Education's income-based repayment program; stating that if a debtor is in default on their student loans, they must first rehabilitate the loans by making nine voluntary payments based on their income level, but no less than $5, before becoming eligible for deferments, forbearances, or the income-based repayment program).

[115] *See* note 98 *supra.*

[116] *Cranmer*, 697 F.3d at 1319 n.5.

[117] § 1325(a)(3).

low. But Ms. Parker is a single woman living in a small town with a seemingly lower cost of living, with equally low expenses of $1393 per month and a $73 per month plan payment. She lives in subsidized housing, eats many of her meals at her grandmother's home, and uses her entertainment "funds" each month solely on cable and internet. Ms. Parker is also used to allocating money based on her particular bills because of the set up of her rent and electricity payment. Ms. Parker is current on her monthly bills and has taken on no new debt. In short, Ms. Parker has carried her burden to show that she will be able to make all her payments under her plan.

Like with Ms. Wark, the prior Debtor, the U.S. Trustee's position would inexplicably require Ms. Parker, who already suffers anxiety, to continue to endure stressful collection activity against her for an unknown period of time, when it is clear she needs bankruptcy relief, and when she has done all the Code requires her to do. Accordingly, the U.S. Trustee's objection to confirmation of Ms. Parker's plan[118] is overruled. The U.S. Trustee's motion to convert[119] is denied.

### D. Blacksmith, Case No. 15-40641

This case is Nichol Blacksmith's second bankruptcy in two years. The circumstances triggering her previous bankruptcy mirror those prior to her current case, and illuminate the financial burden she faced. Ms. Blacksmith's financial distress began in 2008. First, her car was repossessed and she was garnished for the deficiency

---

[118] Case No. 15-40655, Doc. 20.

[119] Case No. 15-40655, Doc. 21.

after that creditor refused to consider a payment arrangement with her. Ms. Blacksmith was then seriously injured in a car accident in 2011 and forced to leave the workforce for two years to recover.

Fast forward to 2014. Ms. Blacksmith had fully recovered from her injuries and was able to return to work. Immediately upon finding reemployment, however, Ms. Blacksmith was garnished yet again for the deficiency on her repossessed vehicle and additionally for payments she missed on her furniture while she recovered. Her creditors also used garnishments to empty her small bank account. Ms. Blacksmith's only daughter had to move out of her mother's house and in with her father because Ms. Blacksmith could no longer afford to support her full-time. Although she had steady income as a cashier, Ms. Blacksmith was unable to save and unable to borrow the requisite funds to pay for representation in Chapter 7.

As she had just returned to work, Ms. Blacksmith did not anticipate receiving a tax refund large enough to satisfy an up front payment to any attorney (even if she could reasonably wait until the next return filing/refund cycle), nor did she have any substantial personal property to offer as collateral for repayment. Instead, like all these Debtors, she elected to pay her attorney's fees through her plan when she filed her first Chapter 13 case.

Ms. Blacksmith's first case had a plan payment of $70 a month and was paid through an employer withholding order. During the pendency of her first case, Ms. Blacksmith lived with her sister, her sister's three children, and their father, and contributed to the household finances as best she could. Unbeknownst to her, Ms.

-56-

Blacksmith's sister fell behind on the electric bill and the house was eventually threatened with a utility shut off. Faced with the choice of making her plan payment or keeping the lights on for herself and her family, Ms. Blacksmith missed her plan payment and her case was dismissed in March 2015. Ms. Blacksmith also lost her job at that time.

Thankfully, within three weeks after her termination, Ms. Blacksmith found a better paying job. But as soon as she began work, her paychecks were again garnished by 25%. Again she was unable to make ends meet. She credibly testified that it would have taken months, if not a year, to save up to pay for Chapter 7 representation. Thus, Ms. Blacksmith filed her second Chapter 13 bankruptcy.

Ms. Blacksmith's debts consist of student loans, medical bills, title loans, utilities, and other various consumer debts such as furniture rentals and credit cards. In total Ms. Blacksmith owes $42,390 in unsecured debt. Ms. Blacksmith lists the IRS and Kansas Department of Revenue as priority unsecured creditors, though the amounts owed to each are unknown.

Ms. Blacksmith has worked for her current employer for eight months and will likely receive a promotion once she finishes a course being offered by her employer that will qualify her to train new hires.[120] Including tax and domestic support deductions, Ms. Blacksmith nets approximately $1470 a month through her employment. Ms.

---

[120] Amended schedules filed November 24, 2015 (Case No. 15-40641, Doc. 81, Debtor's Ex. 13) reflect that she may already have received the raise by the time this Opinion was written.

Blacksmith also receives $400 a month (or $1200 a quarter) in income from her house mate, totaling $1870 a month in household income.

The Court heard testimony from the Standing Chapter 13 Trustee in Topeka, Jan Hamilton. Mr. Hamilton testified that while the national completion rate for Chapter 13 plans was 44.97% in Fiscal Year 2015, the Topeka Division's completion rate was above 65%. The Court also heard testimony from a certified budget expert regarding Ms. Blacksmith's budget. Marilyn Stanley, the chief operating officer of HCCI also testified in this case.[121] Again, Ms. Stanley testified about the options her clients have when they come to HCCI for counseling, including a debt management plan, wherein a customer's debts are consolidated and a portion repaid over time. Compared to a 65.19% completion rate of Chapter 13 cases in Topeka, HCCI's debt management plans have a 54% retention rate at thirty six months and a 13% retention rate at sixty months. Even more importantly, Ms. Stanley testified that a debt management plan was not a feasible option for Ms. Blacksmith as she did not have enough excess monthly income with her garnishment in place to negotiate with the creditors holding the old debt. Ms. Stanley also determined that Ms. Blacksmith had no other option but bankruptcy: she could not borrow the funds to repay her creditors and had no available assets to pledge to pay an attorney or acquire the funds to do so.

According to Ms. Stanley, Ms. Blacksmith's budget is reasonable for a two person household in the Topeka area. Supporting herself and her boyfriend, Ms.

---

[121] A summary of Ms. Stanley's impressive expert qualifications is discussed above in the discussion on the Ellsperman case.

Blacksmith spends $325 a month on rent and $210 on utilities, which includes her phone and internet. Her food budget is slim at $365, although Ms. Stanley regards this as a reasonable amount for two people. Ms. Blacksmith also budgets $15 a month for any additional expenses when her daughter stays with her during weekends, which is on top of the child support she pays each month.

Ms. Stanley also testified that Ms. Blacksmith's medical budget is low for her circumstances. After the filing of her case, Ms. Blacksmith broke her ankle and her recovery may cost between $1400 and $4000 in out-of-pocket expenses. However, Ms. Blacksmith has not had to miss work and dedicates $150 a month for her medical expenses. While reviewing her budget, Ms. Stanley noted that Ms. Blacksmith has comfortably budgeted in other areas such as entertainment and personal grooming, and having these relatively higher expense amounts in the budget may allow her to devote more income to medical expenses, if necessary.

Ms. Stanley also testified about the garnishment process in this jurisdiction. She testified that creditors will start garnishing wages and bank accounts within a couple months after a judgment is entered, but a wage garnishment can only be enforced if the debtor is working. Statutorily, a garnishment can consume up to 25% of a person's wages[122] and 100% of a person's bank account,[123] as Ms. Blacksmith experienced in 2014. Finally, Ms. Stanley testified that a garnishment would make it very difficult to

---

[122] *See* K.S.A. § 60-2310 (Kansas wage garnishment statute, which allows garnishment of 25% of aggregate disposable income).).

[123] *See* K.S.A. § 60-733 (Kansas statute governing garnishment of funds held by financial institutions).

save funds for representation in a Chapter 7, which typically costs around $1800.

Ms. Blacksmith's plan proposes to pay $80 a month for the required applicable commitment period. Ms. Blacksmith makes her plan payments through an employer withholding order, she is $12 ahead on her plan payments, and is current on her postpetition living expenses.

The U.S. Trustee objected to confirmation of Ms. Blacksmith's plan as he did in all these cases, arguing that the plan was not proposed in good faith under § 1325(a)(3), that the petition was not filed in good faith under § 1325(a)(7), and that Ms. Blacksmith's plan was not feasible under § 1325(a)(6).[124] The U.S. Trustee also moved to convert this case to Chapter 7 based on the same arguments.[125] The Standing Trustee also objected to confirmation of Ms. Blacksmith's plan and filed a motion to dismiss her case.[126]

The Court first assesses this case for good faith and finds that under the totality of the circumstances, Ms. Blacksmith filed her petition and plan in good faith. While this is not Ms. Blacksmith's first case, the circumstances surrounding her previous delinquency and subsequent dismissal are no longer present. The Court finds Ms. Blacksmith's explanation for her prior delinquency—that she lost her job and had to pay her sister's electricity bill—sufficient to explain her circumstances. There is no evidence these circumstances are likely to recur.

---

[124] Case No. 15-40641, Doc. 29.

[125] Case No. 15-40641, Doc. 30.

[126] Case No. 15-40641, Docs. 26 and 27.

The Court also finds Ms. Blacksmith to be sincerely motivated to succeed based on the short gap between her employment. She has demonstrated her eagerness to keep her current job by training for a new position—a position that would carry increased responsibility and compensation. In addition, Ms. Blacksmith has since moved out of her sister's home and is now responsible for only her own budget. Ms. Blacksmith understands that any significant increase in her disposable income may lead to a higher plan payment and distribution to her creditors. Ms. Blacksmith's petition and schedules are accurate to the best of her knowledge, she has no secured creditors, owes an unknown amount of back taxes to the IRS and the Kansas Department of Revenue as priority creditors, and does not have any debts that would not be dischargeable under Chapter 7.

Ms. Blacksmith did consider filing for a Chapter 7. Due to her wage garnishments and inability to borrow, however, Ms. Blacksmith determined that she would be better off being represented by counsel in a Chapter 13 bankruptcy. Considering the testimony of the Standing Trustee, it is likely that had Ms. Blacksmith attempted to navigate her Chapter 13 bankruptcy without the assistance of counsel, she may not only have been unsuccessful, but may also have prejudiced herself in other ways. The Standing Trustee also testified that cases such as Ms. Blacksmith's cause his office no more administrative work than the average Chapter 13 case.[127] Since filing

---

[127] Mr. Hamilton testified, during cross examination by the U.S. Trustee, that the average cost per case for his office is between $400 and $500 a year, totaling anywhere between $1200 and $2500 per case. Mr. Hamilton also testified that the Standing Trustee's fee on a plan that hypothetically pays $80 a month for 36 months ($3100 total) would be

her Chapter 13 plan, Ms. Blacksmith has incurred additional medical debt due to her fractured ankle and is grateful for the continued protection of the automatic stay while she heals.[128]

The Court must decide whether, under the totality of the circumstances, Ms. Blacksmith abused the provisions, purpose, or spirit of Chapter 13. Ms. Blacksmith is an honest but unfortunate debtor who even the U.S. Trustee admits has done nothing wrong other than choosing to obtain bankruptcy relief by filing under Chapter 13 upon advice of counsel. She fell behind on her bills while out of work for several years and could not catch up and maintain her living expenses once she eventually went back to work. Her absence from the work force was not a choice, but a necessary condition of her recovery from an auto accident.

While her proposed plan fails to pay any dividend to her unsecured creditors, Ms. Blacksmith is devoting her next three to five years' worth of wages in an effort to allow her unsecured creditors to take part in any increased income she may receive.

---

less than $310—well below the total average cost for his office to administer the case. No testimony was elicited to show how the cost of administering fee only cases compares to the cost of administering an "average" case. The Court assumes the U.S. Trustee pursued this line of questioning to support his argument that fee only cases are burdensome on the Standing Trustee's office because his office must do the same work for less pay. But the Standing Trustee disagrees fee only cases are more burdensome on his staff, probably because the point the U.S. Trustee makes relates to all low dollar cases, not just fee only cases. Because the U.S. Trustee did not develop this argument fully, however, and as the Court must evaluate this factor alongside many others, the Court affords it little weight.

[128] *See In re Crager*, 691 F.3d 671, 675 (5th Cir. 2012) (discussing bankruptcy court's finding of the debtor's "legitimate fear that a future medical problem might leave [the debtor] in a situation in which she had to take on more debt and might need to file another Chapter 13 petition").

Having returned to work, Ms. Blacksmith will likely receive a larger tax return for 2015 and understands a portion of this or future tax refunds, if not exempt, might have to be turned over for distribution to her creditors. Ms. Blacksmith has followed all requirements of the Code and continues to make her plan payments as mandated. Under the totality of the circumstances, the Court does not find that Ms. Blacksmith's motivation or purpose for filing her bankruptcy was to abuse the Bankruptcy Code, but instead, she demonstrated a sincere motivation to complete her Chapter 13 plan and solve her financial situation. Again, even the U.S. Trustee admits she needs bankruptcy relief, and the undisputed testimony shows that filing this Chapter 13 bankruptcy was the only reasonable way for her to get timely relief.

The Court next turns to the issue of feasibility and finds that Ms. Blacksmith's plan, with its associated budget, is feasible in light of the facts presented at trial. Ms. Blacksmith's income has been consistent and stable for the last eight months. Ms. Blacksmith, therefore, satisfies § 109(e)'s requirement that Chapter 13 filers have "regular income." As stated above, Ms. Blacksmith has shown her intent to continue her employment by voluntarily taking on more responsibility at her job.

Ms. Stanley, a budgetary expert, testified that Ms. Blacksmith's budget is reasonable. Although her food budget is low, the remaining budget categories are suitable for a household size of two and remain flexible in light of the potential increased cost of her medical expenses. Ms. Blacksmith credibly testified that she does not believe she will have trouble maintaining her plan payments; the Court agrees and finds her plan as proposed feasible.

The U.S. Trustee's objection to confirmation[129] is overruled and his motion to convert[130] is denied. The Standing Trustee's objection to confirmation and motion to dismiss[131] are also overruled and denied. Confirmation of Ms. Blacksmith's plan is continued to January 27, 2016.

### E.    Tinkham, Case No. 15-40654

Debtor Christine Tinkham had a hard time keeping current on her utilities, and as a consequence, in mid-May 2015 her gas service was shut off. In addition, while Ms. Tinkham—a single mother of her thirteen year old daughter—has medical insurance for herself through her employment, she does not have insurance for her daughter, and past medical bills were catching up to her. Ms. Tinkham is caught in a not uncommon dilemma: she has a good job and makes too much for state-provided insurance for her daughter, but does not make enough to afford the $500 per month premium to add her daughter to her employer's insurance plan.

As a result of both the shut off of her gas service and her daughter's medical bills, Ms. Tinkham filed her first bankruptcy. Ms. Tinkham was quoted an attorney fee rate of $1800 to file a Chapter 7 case. She testified that it would have taken her at least a year to save that much money. And because her typical tax refund is about $500, it would have taken her several years of saving her refunds to make that $1800 payment. Ms. Tinkham testified that she chose Chapter 13 (instead of filing a Chapter

---

[129]    Case No. 15-40641, Doc. 29.

[130]    Case No. 15-40641, Doc. 30.

[131]    Case No. 15-40641, Docs. 26 and 27.

Case 15-40644    Doc# 96    Filed 12/17/15    Page 64 of 107

7 case) because of the up front fee for a Chapter 7 case, but also because she would like to get the bankruptcy off her credit report as soon as possible, and that she understands that a Chapter 13 would be on a credit report for only seven years, compared to a Chapter 7 case that would be reflected on her credit report for ten years.[132]

Ms. Tinkham also testified that she felt the higher attorney's fee for the Chapter 13 case was fair, as it involved her attorney's management of her case for three years, and involved higher risk for her attorney because of the need for her to stay employed throughout the case, and make plan payments, for her attorney to be paid. Finally, Ms. Tinkham filed a Chapter 13 case instead of a Chapter 7 cases because of her daughter's lack of health insurance, and her fear of unknown, future medical bills.

Ms. Tinkham has been employed at a vision clinic since 2007, and is paid $17.87 per hour, netting $2408 per month from her employment. Ms. Tinkham's income is also supplemented by Social Security payments her daughter receives after the death of her father, at $920 per month, for a total monthly income of $3328. Ms. Tinkham's schedule J shows monthly expenses of $3155, leaving her an excess of $173 each month. Ms. Tinkham's budget appears healthy; she budgets only $450 for month for food for her household, but she testified that this amount was comfortable for her family. Ms. Tinkham has taken on no new debt while within bankruptcy, and she is

---

[132] Under 15 U.S.C. § 1681c, Chapter 7 bankruptcies remain on a credit report for 10 years from the date the bankruptcy was filed. § 1681c(a)(1). Completed Chapter 13 bankruptcies remain on a credit report for 7 years from the date filed, but remain for 10 years if not completed. § 1681c(a)(4).

current on all her monthly expenses.

Although the schedules filed with her bankruptcy list her unsecured, non-priority debt at only $4821, Ms. Tinkham testified that her actual debt is closer to $15,000 and that she needs to amend her schedules to add debt she incurred while she was living in another state. She noted she had had difficulty assembling documents for the out of state debts, and indicated the debt she had scheduled represented medical bills, check fees, personal loans, and school fees. Ms. Tinkham has one unsecured, priority debt for state taxes, but the amount is small, only about $150. She has no secured debt.

Ms. Tinkham's plan payment is $110 per month, and is deducted directly from her paycheck by her employer. The Standing Trustee shows that Ms. Tinkham is delinquent for one plan payment, but Ms. Tinkham testified that all payments had been withdrawn from her paycheck, and the parties agreed (as frequently happens at the beginning of these cases, and with employers not used to the bankruptcy process) that the delinquency was probably the result of the employer having not yet submitted the payment to the Standing Trustee. Ms. Tinkham's plan will pay the Standing Trustee's administrative fee, her $3100 attorney's fees, and the $310 filing fee.

The parties stipulated to admission of the full testimony from the *Parker* case,[133] including all objections that were made to that testimony concerning relevance, from Tim Owen, the chief financial officer for Jan Hamilton, the Standing Chapter 13

---

[133] Case No. 15-40655.

Trustee in this Division. Mr. Owen testified about certain statistics he prepared, and noted the national average completion rate for Chapter 13 cases of 44.97% in 2015, compared to the completion rate for Chapter 13 cases in this Division of 65.19%. Mr. Hamilton also testified that employer pay cases have a greater success rate than those where the debtor must send a monthly check because the debtor has no choice whether to use the money to pay the plan payment or another bill, and thus the Trustee payment is made a priority. Mr. Hamilton further testified that employer pay cases are easier for his office to administer.

Mr. Hamilton also testified about his office's treatment of fee only cases, noting that fee only cases cause no additional time or burden for his office simply by being fee only, and that he would not be able to identify fee only cases without looking at individual plans. To compare, Mr. Hamilton testified that pro se cases require significantly more administrative time for his office, and that pro se Chapter 13 cases are rarely successful. In response to this line of questioning, the Court also took judicial notice, without objection by any party, that bankruptcies filed by debtors pro se cause more work for the Court and Court staff. And finally, Mr. Hamilton testified that simply because a Chapter 13 case starts as fee-only, does not mean that ultimately there will not be a dividend for unsecured creditors.[134]

The U.S. Trustee objected to confirmation of Ms. Tinkham's plan as he did to all these cases, arguing that her plan was not proposed in good faith under § 1325(a)(3),

---

[134] *See* note 98 *supra*.

Case 15-40644    Doc# 96    Filed 12/17/15    Page 67 of 107

that her petition was not filed in good faith under § 1325(a)(7), and that her plan was not feasible under § 1325(a)(6).[135] The U.S. Trustee also moved to convert Ms. Tinkham's case to Chapter 7 based on the same arguments.[136]

The Court first assesses Ms. Tinkham's petition and plan for good faith. Ms. Tinkham has filed no prior cases, she does not have any debts that she is attempting to discharge in Chapter 13 that would not be dischargeable under Chapter 7, and she does not owe debts to any secured or priority creditors that she is proposing to modify in her plan. Ms. Tinkham is not treating one class of creditors better than another. Ms. Tinkham is planning to amend her schedules to list additional debt that she inadvertently did not list at filing, but otherwise there are no inaccuracies on her schedules or petition.

Ms. Tinkham's income has been steady and regular for a number of years, as she has worked for the same employer since 2007 and makes a good salary. Most of her debt is old, and exists from before she moved to this area. Her current trouble stems from her inability to keep up with that old debt and also stay current on her utilities. She lived with no gas service for six weeks—more than many people would endure—before consulting an attorney about filing bankruptcy. The U.S. Trustee, again, agrees she needs bankruptcy relief and that she has done nothing wrong other than choosing to file Chapter 13 when she had no ability to pay for the filing of a

---

[135] Case No. 15-40654, Doc. 18.

[136] Case No. 15-40654, Doc. 19.

Chapter 7.

Ms. Tinkham very credibly testified that there was simply no way she could have afforded the up front fee required to hire an attorney to file a Chapter 7 case, and this is one reason she chose Chapter 13 relief. Ms. Tinkham also made a tactical decision: her daughter has no health insurance, and Ms. Tinkham worried about the potential for future medical bills because of that. In addition, she believed it would be better long-term to have her bankruptcy off her credit report as soon as possible.

Ms. Tinkham's budget appears healthy, and she again was credible when she testified that she is committed to the Chapter 13 process and to doing what she needs to complete her case and receive a discharge. Mr. Hamilton testified that fee only cases like Ms. Tinkham's cause no additional administrative burden for his office. Because Ms. Tinkham's plan payment will be made by employer payment, Mr. Hamilton believes it will have a greater chance of success and be easier for his office to administer. Simply put, there appears to be no obstacle to Ms. Tinkham's success in this case.[137] And although Ms. Tinkham's unsecured creditors may receive no distribution, this factor alone does not tip the balance of factors, and the Court sees no evidence at all that Ms. Tinkham's petition and plan were not filed in good faith.

Ms. Tinkham's case is also feasible. Her net income from employment is $2408 per month, and her daughter also receives $920 per month in Social Security, making

---

[137] And the Court notes that statistical evidence presented demonstrates that many of the Chapter 13 cases in this District are successful, much more so than the national average for such cases.

her total monthly income $3328. With monthly expenses of $3155, she has $173 each month from which to make her $110 plan payment. Ms. Tinkham's budget is comfortable for her family and appears reasonable to the Court. Ms. Tinkham has taken on no new debt and is current on all her monthly bills. The Court is concerned about Ms. Tinkham's daughter not having health insurance, but because of some wiggle room in Ms. Tinkham's budget,[138] this concern is abated. Ms. Tinkham has easily met her burden to show feasibility under § 1325(a)(6).

The U.S. Trustee objection to confirmation[139] is overruled and his motion to convert[140] is denied.

### F.    Neu, Case No. 15-40647

The circumstances precipitating debtor Jacob Neu's bankruptcy were dire. A wage garnishment caused Mr. Neu to fall behind on his rent payments, forcing him to move three times in a year. His financial condition and associated moving costs created additional emotional stress effecting his home and work life. Eventually, both Mr.

---

[138]    For example, Ms. Tinkham budgets $140 per month for her daughter's violin lessons—frankly the only "luxury" in almost any of these Debtors' budgets. Obviously, the Court hopes Ms. Tinkham's daughter remains healthy and these violin lessons are able to continue, but if an emergency did arise, it would provide a source of funds for that emergency. Similarly, the Code requires below median income debtors to remain in a Chapter 13 plan for only three years, but it allows debtors to remain for up to five years. This 24 month gap is another way below median income debtors are sometimes able to complete their plans, even if they temporarily lose a job or have an unexpected expense. In that event, debtors can seek to modify their plans under § 1329 to skip a plan payment or two, and add those payments on the end and still complete their plans within the allotted five year period. This fact also serves to make many below median debtors' plans feasible even when their "slim" budgets do not show much room for error.

[139]    Case No. 15-40654, Doc. 18.

[140]    Case No. 15-40654, Doc. 19.

Case 15-40644    Doc# 96    Filed 12/17/15    Page 70 of 107

Neu's personal relationship with his fiancée and job were jeopardized. Unable to pay his bills, Mr. Neu, for the first time, sought relief under the Bankruptcy Code.

Mr. Neu has been employed deconstructing cars for the past four years and makes approximately $1766 a month so long as he meets his quota of ten to twelve deconstructions a week. Prior to filing this case, Mr. Neu was being garnished between $250–$300 a pay period (13–17% of his wages) based on a deficiency he owed on a repossessed car. This garnishment, and the financial and emotional stress that followed, distracted Mr. Neu at work and at home. Mr. Neu had trouble maintaining his quota at work and fought constantly with his fiancée, leading to a breakdown of their 10 year relationship.

Mr. Neu chose to file his bankruptcy under Chapter 13 because, despite trying to save for over a year prior to filing, he could not pay (nor hope to borrow the money necessary) for representation in a Chapter 7 bankruptcy while having his wages garnished. Mr. Neu also feared that should he choose Chapter 7, he would have to sell his late brother's truck, which holds a great deal of sentimental—though little monetary—value.

Post bankruptcy filing, Mr. Neu's employment and personal life are now stable and he continues to bring home approximately $1766 a month. Mr. Neu maintains health insurance for himself through a monthly $172 deduction in his wages and pays $270 through his paycheck for tools he needs to complete his daily tasks. Mr. Neu does not have any significant assets. He owns two cars free and clear, one worth approximately $1000 that he uses for transportation and one worth approximately

$300; the latter is the car that belonged to his now deceased brother and qualifies as a non-exempt asset. Mr. Neu has received between $2000 and $3000 in tax refunds for each of the last two years and anticipates a similar tax refund for the current year.

Mr. Neu's expenses are, at first blush, extremely low. He testified that his rent payment has been reduced from $575 to $400 since the filing of his schedules but knows of no other inaccuracies in his filings. He only budgets $300 a month for food and housekeeping expenses, nothing for clothing and laundry, medical, or entertainment, and only $40 for personal care products. These estimates would be low for a household size of one; Mr. Neu shares his house with his fiancée and her two adult daughters, however, although he testified that their finances are kept separate.

Mr. Neu's debt consists primarily of unsecured consumer debt and medical bills. He has three secured creditor claims on his work tools, and plans to continue to pay those debts from his wages, outside his bankruptcy. He has no unsecured priority debt. Mr. Neu's plan proposes to pay $90 a month for the required applicable commitment period, and these payments are made via an employer pay order. Mr. Neu's plan will pay $310 to the Court in filing fees, $3100 to his attorney for fees and closing costs, and the remainder to the Standing Trustee for administering the case. Mr. Neu's general unsecured creditors, which total approximately $11,645, will receive nothing under the current plan. At the time of trial, the parties stipulated that Mr. Neu was not delinquent on his plan payments and Mr. Neu testified that all of his monthly living expenses were current.

The Court heard testimony at trial from the Standing Chapter 13 Trustee in

Topeka, Jan Hamilton. Mr. Hamilton testified that while the national completion rate for Chapter 13 Plans was 44.97% in Fiscal Year 2015, the Topeka Division's completion rate was above 65%. Mr. Hamilton also noted that fee only cases cause no additional administrative burdens for his office simply by being fee only. Comparatively, pro se cases require significantly more administrative time for his office and are rarely successful.

The U.S. Trustee objected to confirmation of Mr. Neu's plan as he did to all these cases, arguing that the plan was not proposed in good faith under § 1325(a)(3), that the petition was not filed in good faith under § 1325(a)(7), and that Mr. Neu's plan was not feasible under § 1325(a)(6).[141] The U.S. Trustee also moved to convert Ms. Neu's case to Chapter 7 based on the same arguments.[142]

The Court first assesses this case for good faith and finds that under the totality of the circumstances, Mr. Neu filed his petition and plan in good faith. This is Mr. Neu's first bankruptcy case and, with the exception of his decreased rent payment, his schedules and filings are accurate to the best of his knowledge. Mr. Neu understands that any significant increase in his disposable income may lead to a higher plan payment and distribution to his creditors. Although Mr. Neu has no debts that would not be dischargeable under Chapter 7, he does have one asset with tremendous sentimental value that could be liquidated in Chapter 7 that he proposes to retain and

---

[141]  Case No. 15-40647, Doc. 25.

[142]  Case No. 15-40647, Doc. 26.

pay liquidation value through his plan.

Mr. Neu considered filing Chapter 7. He tried to save enough money over the year prior to filing his case to pay for representation, but was unable to do so because his wages were being garnished. Mr. Neu had no one to ask for help and it was not feasible for him to wait, while being garnished, for the next seven or eight months until the next tax refund cycle, to obtain a tax refund and then seek bankruptcy relief. Mr. Neu feared that should he file a Chapter 7 bankruptcy, he might lose his deceased brother's vehicle. Had his only option been to file his bankruptcy without the assistance of counsel, he would not have filed at all.

With his job and relationship on the line, Mr. Neu could wait no longer for relief under the Code—relief the U.S. Trustee agrees he needs. Mr. Neu has followed all requirements of the Code and continues to make his plan payments as mandated by his plan. The Standing Trustee testified that the fee only nature of this case does not per se create more administrative work for his office than any other kind of Chapter 13 case. The Court does not find any evidence that Mr. Neu's filing or plan were an attempt to abuse the provisions, purpose, or spirit of Chapter 13, and the U.S. Trustee agrees Mr. Neu has done nothing wrong other than to opt for a Chapter 13 case.

Although his unsecured creditors may receive nothing under his plan as proposed, the Court does not find this treatment unfair or inequitable as they would have received the same under Chapter 7. In fact, any improvement in Mr. Neu's finances could mean a return for his unsecured creditors that they otherwise would not

have been entitled to.[143] Mr. Neu, pressured by the financial and emotional stress of a wage garnishment, made an honest and informed decision to devote his next three to five years' wages to repay his debts. Under the totality of the circumstances, the Court finds that Mr. Neu's case meets the requirement of good faith.

The Court next turns to the issue of feasibility and finds that Mr. Neu's plan and associated budget are feasible in light of the facts of his case. Mr. Neu's income is consistent and stable as he has been employed with the same employer for over four years and plans to remain in his current position. Mr. Neu, therefore, satisfies § 109(e)'s requirement that Chapter 13 filers have "regular income." On the other hand, Mr. Neu's expenses are slim. Mr. Neu justified his expenses by credibly testifying that all the food he consumes at home is purchased by his fiancée and the $300 listed on his schedule J goes only toward meals at work. He also testified that his work clothes (and, on occasion, his personal clothes) are provided and cleaned by his employer and that he is not required to 'dress up' for his job. Since his finances are so thin and his work so physically grueling, Mr. Neu does not have the time or energy to spend money on entertainment. He has remained current on all of his living expenses since filing, and he appeared sincere when testifying that he is confident that he will remain so. Finally, Mr. Neu's and his fiancée's finances are completely separate (with the exception of his food consumption at home) and therefore her expenses are not represented in his budget. Mr. Neu's rent payment has also decreased since the filing

---

[143] *See* note 98 *supra*.

of his petition, giving him a small cushion for any unforeseen expenses. Mr. Neu has demonstrated to the Court that he is committed to his plan. The Court finds Mr. Neu's plan as proposed is feasible and satisfies the requirement of § 1325(a)(6).

The U.S. Trustee's objection to confirmation[144] is overruled and his motion to convert[145] is denied. Plan confirmation is continued to January 27, 2016.

### G. Rayton, Case No. 15-40644[146]

Debtor DaVonna Joyce Rayton, like many of these Debtors, sought bankruptcy relief because of medical debt. Although there was no active garnishment of Ms. Rayton's wages at the time she filed her bankruptcy petition, Ms. Rayton believed she was about to be garnished as a result of a $10,000 judgment stemming from unpaid medical bills. Ms. Rayton's overall debt picture is typical of the cases under consideration herein: she has no secured debt or unsecured priority debt, but has

---

[144] Case No. 15-40647, Doc. 25.

[145] Case No. 15-40647, Doc. 26.

[146] The evidence admitted at trial of this matter was sparse: despite having the burden of proving that her plan meets the requirements of § 1325(a), counsel for Ms. Rayton elected to offer into evidence only Ms. Rayton's deposition, rather than her live testimony. The only other evidence admitted was the Standing Trustee's record of Ms. Rayton's plan payment history. Because the deposition was taken by the U.S. Trustee, the deposition does not elicit the facts that would have been necessary to support Ms. Rayton's burden of proof. And even though there was live cross examination and re-direct of Ms. Rayton at trial, the facts were simply not developed in Ms. Rayton's favor.

The Court has been able to supplement the sparse trial record with facts gleaned from Ms. Rayton's petition and schedules. *See Sherman v. Rose (In re Sherman)*, 18 Fed. App'x 718, 721 (10th Cir. 2001) (noting that "a bankruptcy court may take judicial notice of schedules to the bankruptcy petition filed by the debtor" and that it "may even take notice of schedules, averments and statements filed in prior bankruptcy cases"). From the record in this case, the Court is able to elicit a picture—however bleak—of the feasibility of Ms. Rayton's Chapter 13 plan.

unsecured, non-priority debt consisting of payday loans, medical bills, utilities, and student loans. Ms. Rayton chose to file a Chapter 13 petition, rather than a Chapter 7 petition, because she could not raise the money to pay an attorney up front, and could not have borrowed or saved for the Chapter 7 attorney's fee.[147]

Ms. Rayton has been employed as a certified nurses aide with the same employer since September, 2013. Although her employment has been stable, there have been other significant changes to Ms. Rayton's household and budget. At the time of filing her petition, Ms. Rayton was expecting her second child. She has now delivered her baby, and her household size has increased from two to three. Ms. Rayton's employment income has not changed, however, and by any measure, it is very low: she earns only $1366 per month for her household of three. There are supplements to this employment income, however—Ms. Rayton's schedule I also reflects $135 per month in food stamps, and she testified at trial that the food stamp award had increased by about $100 with the birth of her second child. And finally regarding monthly income, Ms. Rayton's schedule I lists $400 per month in amortized tax refunds.

Many debtors use their tax refund to buy clothing or other items they can defer purchasing, or to get current or pay ahead on rent, etc. Ms. Rayton testified at trial that the reality is that she consumes her tax refund upon receipt each year, and when she filed this case in June 2015, she had already spent her full refund. Thus, she does not actually have $400 a month in her budget to spend until (and if) a similar 2015

---

[147] In this case, Ms. Rayton's counsel would have charged $1500 for the filing of a Chapter 7 petition.

refund is received. As a result of these changes to her schedule I report of income (increasing the food stamp income but deducting the amortized tax refund), Ms. Rayton's actual monthly income for now is only $1601.

Regarding expenses, Ms. Rayton's schedule J at filing showed monthly expenses of $1620, and expressly noted that her expenses would increase with the birth of her second child. At trial, Ms. Rayton testified that her child care and food expenses had not increased, because she receives public assistance for child care and formula, but that her expenses had increased overall because of the cost of diapers. Ms. Rayton testified that her monthly rent had also increased by $5 to $500 since filing. And finally, Ms. Rayton testified that she may have additional medical expenses from the caesarean birth of her child, but she does not yet know because she has not received those bills.

Ms. Rayton's proposed plan requires a plan payment of $100 per month for thirty six months, and that plan payment is made by her employer via an income withholding order. Ms. Rayton's plan proposes to pay her attorney a fee of $3100, the Trustee's administrative fee, and the $310 filing fee. Ms. Rayton is current on her plan payments and at the time of trial actually had overpaid by about fifteen dollars.

The U.S. Trustee objected to confirmation of Ms. Rayton's plan as he did to all these cases, arguing that her plan was not proposed in good faith under § 1325(a)(3), that her petition was not filed in good faith under § 1325(a)(7), and that her plan was

not feasible under § 1325(a)(6).[148] The U.S. Trustee also moved to convert Ms. Rayton's case to Chapter 7 based on the same arguments.[149]

The Court first assesses this case for feasibility, as it finds that to be dispositive. Regarding income, it is true that Ms. Rayton's income is consistent and stable: she has been employed with her same employer for two years, and she receives a steady paycheck. Ms. Rayton, therefore, satisfies § 109(e)'s requirement that Chapter 13 filers have "regular income." The problem for Ms. Rayton, however, is that there just isn't enough of that income to go around. It is difficult to see from her filed schedules and the testimony received how she can meet her monthly obligations for her household of three and also make a plan payment. Ms. Rayton testified that she does not have any remaining funds from her yearly tax refund and that the refund was spent on necessities soon after receipt. As a result, her monthly income, from employment and her increased food stamp award, totals only $1601 for her family of three for the next several months. But her monthly expenses at the time of filing were $1620, and she readily testified that her expenses increased with the birth of her second child.[150] Ms. Rayton's schedule J also specifically notes that her expenses will increase. The Court was simply unconvinced that there was a feasible way to add a plan payment of $100

---

[148]  Case No. 15-40644, Doc. 22.

[149]  Case No. 15-40644, Doc. 23.

[150]  The actual amount of the increase is also uncertain. While Ms. Rayton testified that she must now buy diapers, the cost of those diapers was not elicited. In addition, Ms. Rayton testified to potential additional medical expenses, but this was also not clarified. The only exact number given at trial was the increase in rent of $5 per month.

-79-

per month on top of Ms. Rayton's monthly obligations.

And although Ms. Rayton was current with her plan payments at the time of trial, the Court acknowledges that maintaining a plan payment while the U.S. Trustee's objection to confirmation is pending is one thing. Maintaining plan payments throughout the 36 months of her case is another matter. The Court finds it unlikely that Ms. Rayton has the present or future capacity to fund the required plan payment,[151] and finds that Ms. Rayton's case is not feasible. Based on the facts given at trial and the record in this case, Ms. Rayton has not demonstrated she will be able to both make her plan payment and keep current on her necessary household expenses.[152] She seemed unaware of these budget realities, and failed to carry her burden of proving that she "will be able to make all payments under the plan and to comply with the plan."[153]

The U.S. Trustee's objection to confirmation[154] based on feasibility is sustained.[155] Ms. Rayton shall dismiss or voluntarily convert her case to Chapter 7 within fourteen days, or the U.S. Trustee may submit an order granting his motion to

---

[151] *See In re Heck*, 355 B.R. 813, 825 (Bankr. D. Kan. 2006) (finding that, even if the debtor's income satisfied § 109(e)'s eligibility criteria, the court could not conclude that the debtor would "be able to make all the payments proposed for the duration of her plan).

[152] *See In re Rose*, 14 B.R. 649, 656 (Bankr. D. Kan. 1981) (finding that understated expenses merited the conclusion that eventually, the debtors would either "be unable to pay the trustee . . . or will be unable to meet their necessary living expenses").

[153] § 1325(a)(6).

[154] Case No. 15-40644, Doc. 22.

[155] The Court finds it unnecessary, therefore, to rule on the additional bases within the U.S. Trustee's objection to confirmation.

Case 15-40644    Doc# 96    Filed 12/17/15    Page 80 of 107

convert.[156]

### H.    Tetuan/Milholen, Case No. 15-40566

Debtors Tanner Tetuan and Stephenie Milholen have had a rough go of it. The young couple have two children, ages seven and four, and have had difficulty maintaining their monthly household budget in the face of chronic medical conditions and periodic unemployment. Mr. Tetuan suffers from mental illness—an identity disorder that also causes anxiety—and about a year and a half to two years ago he suffered a breakdown for which he sought inpatient treatment. Mr. Tetuan has also received treatment for kidney stones. In addition to the medical hardships these events have caused, they have also caused financial hardships, as Mr. Tetuan did not then and still does not have health insurance and was unable to work while hospitalized.

Mr. Tetuan has now been employed as a night stocker at Walmart for about two years. His employment does not currently offer him health insurance, but he will qualify for health insurance in January, at a cost of about $36 to $40 per month. There was no testimony what this insurance would cover or whether there would be

---

[156] It may well be that conversion will be in Ms. Rayton's best interest because of her testimony that she has not yet received final bills associated with the post-petition birth and care of her newborn child, and that she may thus have incurred postpetition medical bills associated with her prenatal care and delivery. *See* § 727(b) (discharging debts that "arose before the date of the order for relief *under this chapter*"); § 348(d) ("A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section . . . 1307 of this title, other than a claim [for administrative expenses], shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition."). The Court will not make this choice for Ms. Rayton, however, in light of language in the Code permitting Ms. Rayton to dismiss her case at any time. *See* § 1307(b) ("On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter. Any waiver of the right to dismiss under this subsection is unenforceable.").

Case 15-40644    Doc# 96    Filed 12/17/15    Page 81 of 107

deductible costs or co-pays. This could be significant because his lack of health insurance has resulted in him not regularly taking prescribed medications for his health problems because he cannot afford them. Ms. Milholen and the couple's two children have health insurance through the state. Ms. Milholen suffers from poor dental health, but the couple's children are currently healthy.

Although Mr. Tetuan has enjoyed relatively stable employment, Ms. Milholen has had the opposite experience. She was not employed on the petition date, and was applying for jobs at that time. She did receive a job offer and worked about a month until Mr. Tetuan was arrested on an outstanding court fine (resulting from a ticket received from being in a park with his children after hours), and she missed work to care for their children. As a result, she was fired. Ms. Milholen has had three or four short term jobs over the last five years along with long periods of unemployment. Although she is certified as a nurses aide and a medicine aide, she is not employed now and has been looking, without success, for employment since the case was filed six months ago. Ms. Milholen is also half way through a program to obtain her GED, having only completed ninth grade.

Mr. Tetuan and Ms. Milholen do typically receive a large tax refund. With the refund they received in early 2015, Mr. Tetuan and Ms. Milholen paid off the $2700 he owed on his 1994 Chevy truck, bought beds for their children, caught up delinquent utility bills, and purchased a used minivan for Ms. Milholen to travel to school. They expect to receive a refund for future tax years, and typically use that refund to catch up on bills and buy needed clothes and items for their children.

-82-

About five or six months prior to filing their Chapter 13 case, Mr. Tetuan's paycheck began to be garnished approximately $150 to $175 every two weeks. The garnishment obviously made their monthly budget hard to handle, and Ms. Milholen testified that with the garnishments, they were able to pay only about half of their normal monthly expenses. The garnishments continued for five or six months, and ultimately, Mr. Tetuan and Ms. Milholen pursued bankruptcy because they could not stay caught up on their bills in light of the continuous garnishment. Two additional collection cases were pending against them at the time they filed their bankruptcy petition.

Neither Mr. Tetuan nor Ms. Milholen have filed a previous bankruptcy. They filed their Chapter 13 bankruptcy petition because they could not afford the Chapter 7 attorney's fee. Because of the continued garnishment, they could not save money to pay the fee, and had no way to borrow the money. They also chose Chapter 13 because of their understanding of the differences in the time in which a new bankruptcy case could be filed. Mr. Tetuan testified that he understood that he would have to wait eight years to file a subsequent/second Chapter 7 case, but would only have to wait two years to file a new Chapter 13 case, and that it was a lot easier to predict what would happen in two years than eight years. Mr. Tetuan and Ms. Milholen testified that they understood that if Ms. Milholen started working and their income increased, they may need to increase their plan payment, but Mr. Tetuan testified that he wished to stay in the Chapter 13 case because it would be more flexible for his family.

Mr. Tetuan and Ms. Milholen's plan payment is $75 per month for 36 months.

Their plan pays $2983 in attorney's fees and the Trustee's administrative fee. Mr. Tetuan and Ms. Milholen are current on their monthly plan payments, and are actually a little ahead. Mr. Tetuan and Ms. Milholen have no secured debt or unsecured priority debt, but they have $27,030 in unsecured, non-priority debt (consisting mostly of medical and utility bills, with one payday loan). Their plan as proposed will pay zero to their unsecured creditors.

The schedule I in this case shows that Mr. Tetuan earns $1371 per month, and he testified that he hoped this income would increase as he is in line to be trained for a manager position. In addition, while Ms. Milholen is entitled to receive child support payments of $203 per month, she admitted she does not regularly receive this amount. The household income also includes $318 each month in food stamps. This has also changed, although for the better, recently increasing to $500 per month. With those changes to their schedule I,[157] the actual household income each month is about $1871, not $1892 as reported at filing. The filed schedule J shows monthly expenses of $1814, with a monthly excess of $78 for the plan payment. But again, there are changes post filing in expenses: Mr. Tetuan testified that the food and housekeeping supplies budget item should actually be higher than the $525 listed, as his family spends about $150 to $200 a week on these items—meaning at least $650 to $700 per month. Ms. Milholen testified that their food and housekeeping expense was not actually quite that high, but was about $600 to $650 per month.

---

[157] Adding $1371 in wages to $500 in food stamps; not counting the $203 per month in child support.

Mr. Tetuan also testified that their transportation expense budget would need to increase, as both their vehicles need oil changes and the van's transmission slips and needs a new tire rod. Ms. Milholen responded, however, that she hoped these vehicle repairs could wait until they received their next tax refund. The vehicle insurance budget also needs to increase, from the $62 stated in schedule J to about $120 per month.

Mr. Tetuan testified that his household is current on their postpetition bills except for the electricity bill because of high costs of air conditioning over the summer. They have started a payment plan to bring this postpetition bill current, but are still about $200 behind. Mr. Tetuan also testified that his monthly payment of $50 for court fines had not been made for the last month, so he is $50 in arrears on that debt. Mr. Tetuan testified that they have not incurred any other new debts or payday loans since filing.

The parties stipulated to admission of the full testimony from the *Parker* case,[158] including all objections that were made to that testimony concerning relevancy, from Tim Owen, the chief financial officer for Jan Hamilton, the Standing Chapter 13 Trustee in this Division. Mr. Owen testified about certain statistics prepared by him, and noted the national average completion rate for Chapter 13 cases of 44.97% in 2015, compared to the completion rate for Chapter 13 cases in this Division of 65.19%. Mr. Hamilton also testified, stating that cases with small monthly payments such as fee

---

[158] Case No. 15-40655.

only cases cause no more or less burden on his office than any other case. Mr. Hamilton testified that when a plan payment is made via employer payment, there is a much higher chance of success than self-pay cases. And finally, Mr. Hamilton testified that, in comparison, pro se Chapter 13 cases are much more administratively burdensome for his office and have a very low success rate. In response to this line of questioning, the Court also noted, without objection by any party, that it would take judicial notice of the fact that cases filed by debtors representing themselves cause more work for the Court and Court staff.

The U.S. Trustee objected to confirmation of Mr. Tetuan and Ms. Milholen's plan as he did to all these cases, arguing that the plan was not proposed in good faith under § 1325(a)(3), that the petition was not filed in good faith under § 1325(a)(7), and that the plan was not feasible under § 1325(a)(6).[159] The U.S. Trustee also moved to convert this case to Chapter 7 based on the same arguments.[160]

Again, the Court first assesses this case for feasibility, as it finds that to be dispositive. Regarding income, with the testified changes to the reported amounts for child support and food stamps, Mr. Tetuan and Ms. Milholen's current monthly household income is only $1871. And frankly, the prospects for that income to appreciably rise do not appear to be favorable. Mr. Tetuan has had relatively stable

---

[159] Case No. 15-40566, Doc. 17.

[160] Case No. 15-40566, Doc. 18.

employment and hopes for a raise and a manager position,[161] but Ms. Milholen has had repeated trouble securing and keeping employment. The evidence shows that Ms. Milholen has not kept a job for long, and although she looks for new employment every day, has been unable to find a position for many months. And Mr. Tetuan testified that he hoped he would receive a raise with a promotion at his job, but no concrete details were provided as to how or when this could happen. It appears to be his hope, but nothing more concrete than that.[162]

Debtors' household expenses pose an even bigger problem. The filed schedule J lists expenses of $1814. Comparing this to the modified income number, there is only $56 leftover each month to make a $75 per month plan payment. Obviously, this alone would be troubling. But even if Ms. Milholen did start regularly receiving the child support owed, the evidence showed that monthly expenses were actually higher than this reported figure. The budget for food and household supplies needs to be increased by a minimum of $75 and as much as $375. The budget for transportation expenses must also increase, as both household vehicles need regular maintenance (oil changes) and Ms. Milholen's van needs repairs. And the vehicle insurance budget needs to double, from the $62 stated in schedule J to about $120 per month. It is no wonder that Mr. Tetuan and Ms. Milholen are already behind on their monthly bills: the electricity bill is delinquent and Mr. Tetuan is behind on making his monthly payment for court

---

[161] As a result, Mr. Tetuan and Ms. Milholen satisfy § 109(e)'s requirement that Chapter 13 filers have "regular income."

[162] *Cf. In re Roe*, 16 B.R. 706, 710 (Bankr. D. Kan. 1982) (noting that "changed circumstances" can "necessitate a fresh analysis of feasibility").

fines. The plan payments in this case are current, but Mr. Tetuan and Ms. Milholen must be able to stay current on all bills, not just their plan payment, if they are to have a feasible plan.[163]

No matter the approach, the math just does not work in Mr. Tetuan and Ms. Milholen's favor. Mr. Tetuan and Ms. Milholen's plan payment is only $75 per month, but their budget just does not support this plan payment. As a result, Mr. Tetuan and Ms. Milholen did not carry their burden of proving that they "will be able to make all payments under the plan and to comply with the plan."[164]

The U.S. Trustee's objection to confirmation[165] based on feasibility is sustained.[166] It is sad to say that Mr. Tetuan and Ms. Milholen fall into the ever rising class of debtors who are, ironically, simply too poor to file bankruptcy (if they want the luxury of having counsel assist them—something this Court always recommends for reasons previously noted). Mr. Tetuan and Ms. Milholen shall dismiss or voluntarily convert their case to Chapter 7 within fourteen days, or the U.S. Trustee may submit an order granting his motion to convert.[167]

---

[163] *Cf. In re Dipman*, No. 09-10620, 2009 WL 3633327, at *4 (Bankr. D. Kan. Oct. 29, 2009) (finding a plan not feasible where the debtors were behind on postpetition mortgage payments and plan payments and had "uncertain" employment).

[164] § 1325(a)(6).

[165] Case No. 15-40566, Doc. 17.

[166] The Court finds it unnecessary, therefore, to rule on the additional bases within the U.S. Trustee's objection to confirmation.

[167] Case No. 15-40566, Doc. 18. Again, the Court will not make this choice for Mr. Tetuan and Ms. Milholen, in light of language in the Code permitting dismissal of a case at any time. *See* § 1307(b) ("On request of the debtor at any time, if the case has not been

-88-

## I.      Huggins, Case No. 15-40681

Ms. Huggins' story reads much like many others: while working a low paying job, she had started to fall behind on her living expenses when she was suddenly hit with a garnishment of $75 per paycheck. Ms. Huggins testified that the impact of that garnishment made it difficult for her to pay her utilities and rent while also putting food on the table. Already stretched thin, Ms. Huggins took out payday loans and a title loan to cover her rent and other basic needs. With five children and three adults living in her house, those needs were not small. Finally, with the threat of an electricity and gas shut off and constant calls and letters from creditors, Ms. Huggins ran out of options and turned to the Bankruptcy Code for relief.

Ms. Huggins considered filing for Chapter 7, but was unable to save up for the cost of representation and could not borrow the money. Additionally, Ms. Huggins frequently sees a doctor and while she now has health insurance, she did not anticipate getting it at the time of filing. Ms. Huggins feared that should she file a Chapter 7 and continue to need medical care, her discharge would not protect her from future garnishments for medical debt.

Ms. Huggins is employed as a housekeeper and has worked for the same employer for approximately six months. She is paid $8 an hour and hopes to receive a raise in the future, but is unsure of the likelihood of this happening. Ms. Huggins nets approximately $1408 a month through her hourly wages and supplements her income

converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter. Any waiver of the right to dismiss under this subsection is unenforceable.").

-89-

with $385 in food stamps and $100 she receives from her aunt in exchange for watching her nephew. This income breakdown varies significantly from the income listed in her schedule I due primarily to the postpetition loss of two other incomes from her household.

At the time Ms. Huggins filed her bankruptcy, her brother, his two children, their mother, and Ms. Huggins' two step-children were all living under her roof. Ms. Huggins' original schedules reflected $721 in Social Security income and $185 in food assistance contributed by her brother in addition to her hourly wages. Her original schedules also accounted for the expenses of a seven person household. Subsequent to filing, Ms. Huggins' brother, his family, and her two step-children moved out, taking their monetary support with them. While Ms. Huggins has not filed amended schedules to reflect the changes, the Court assumes her expenses have similarly been reduced.

Ms. Huggins testified at trial that she now has health insurance, but without amended schedules or concrete testimony, it is unclear how this reduces her income or increases her expenses. Ms. Huggins also testified at her deposition that she plans to pay her student loan creditors outside of her plan. Again, it is unclear whether that amount is reflected in her budget. Beyond her food stamp allocation, Ms. Huggins does not receive government assistance and does not pay for childcare, as her brother continues to watch her two year old son while she works.

Ms. Huggins has no significant assets. She owns her car, worth approximately $900, subject to a high interest title loan, and does not own any other substantial

personal or real property. Ms. Huggins expects to receive a tax refund for 2015, but does not have an estimate of its value because she has not been required to file tax returns for the past several years.

Ms. Huggins' debt consists primarily of student loans, payday loans, a title loan, unpaid utility bills, and medical bills. In total, Ms. Huggins owes about $16,203 to her unsecured creditors and $400 to her title loan creditor. Her plan proposes to pay $100 a month for the required applicable commitment period and from that stream of payments will pay $3158 to her attorney for fees and closing costs, $400 to her title loan creditor, $310 to the Court in filing fees, and the remainder to the Trustee for administering her estate. Ms. Huggins' unsecured creditors will not receive a distribution under her plan as proposed. Ms. Huggins makes her plan payments through an employer income withholding order and is currently $15 ahead in her plan payments.

At trial, Ms. Huggins admitted she was already three and a half months behind on her rent payments. Due to the reduction in her household income after the departure of her brother and his family, she was unable to stay current on her rent and has since found an apartment with a lower rent payment. Ms. Huggins testified that her rent has been reduced from $525 to $395 a month and could possibly go as low as $230. However, she has not been able to repay her previous landlord for the payments she missed post-petition. Ms. Huggins also recently amended her schedules to include a postpetition electric bill of $478. Thus, Ms. Huggins is already robbing Peter to pay Paul—making her plan payment but at the expense of regular monthly bills.

The Court heard testimony at trial from the Standing Chapter 13 Trustee in Topeka, Jan Hamilton. Mr. Hamilton testified that while the national completion rate for Chapter 13 Plans is 44.97% in Fiscal Year 2015, the Topeka Division's completion rate was above 65%. Mr. Hamilton also noted that fee only cases cause no additional administrative burden for his office simply by being fee only. Comparatively, pro se cases require significantly more administrative time for his office and are rarely successful.

The U.S. Trustee objected to confirmation of Ms. Huggins' plan as he did to all these cases, arguing that her plan was not proposed in good faith under § 1325(a)(3), that her petition was not filed in good faith under § 1325(a)(7), and that her plan was not feasible under § 1325(a)(6).[168] The U.S. Trustee also moved to convert this case to Chapter 7 based on the same arguments.[169]

The Court first assesses this case for feasibility, as it finds that to be dispositive. Ms. Huggins' employment income is consistent and stable and satisfies § 109(e)'s requirement that Chapter 13 filers have "regular income." However, Ms. Huggins' income has significantly declined since filing, and her current income is approximately $1408 a month in wages, $385 in food stamps, and $100 from her aunt, for a total income of $1893. Her monthly expenses at filing were $2587, and while these have likely declined due to her smaller household (e.g., food, electricity, personal care

---

[168] Case No. 15-40681, Doc. 19.

[169] Case No. 15-40681, Doc. 20.

Case 15-40644    Doc# 96    Filed 12/17/15    Page 92 of 107

products), the Court cannot quantify the impact of that reduction because this testimony was not elicited at trial. And even with a reduction, the gap between income and expenses is so significant that the Court cannot find that Ms. Huggins will be able to make her monthly plan payment while maintaining her monthly budget. The Court finds it telling that Ms. Huggins has already fallen behind on rent payments and her utilities.

Ms. Huggins also took on another needed expense—health insurance. Again, it is not clear to the Court what the out-of-pocket expense will be for Ms. Huggins' doctor's visits and whether the insurance payment comes out of her wages, her budget, or both. With so much uncertainty, it is hard to see how Ms. Huggins will continue to make ends meet.

It is heartening that Ms. Huggins was current in her plan payments at the time of trial. However, the Court is not convinced that this status can continue on the budget as presented for the required duration of the plan. The Court finds it unlikely that Ms. Huggins has the present or future capacity to fund a plan payment,[170] and finds that Ms. Huggins' case is not feasible. Based on the facts given at trial and the record in this case, Ms. Huggins is not able to both make her plan payment and stay current on her necessary living expenses.[171] Ms. Huggins did not carry her burden of

---

[170] *See In re Heck*, 355 B.R. 813, 825 (Bankr. D. Kan. 2006) (finding that, even if the debtor's income satisfied § 109(e)'s eligibility criteria, the court could not conclude that the debtor would "be able to make all the payments proposed for the duration of her plan").

[171] *See In re Rose*, 14 B.R. 649, 656 (Bankr. D. Kan. 1981) (finding that understated expenses merited the conclusion that eventually, the debtors would either "be unable to pay the trustee… or will be unable to meet their necessary living expenses").

proving that she "will be able to make all payments under the plan and to comply with the plan."[172]

The U.S. Trustee's objection to confirmation[173] based on feasibility is sustained.[174] Ms. Huggins shall dismiss or voluntarily convert her case to Chapter 7 within fourteen days, or the U.S. Trustee may submit an order granting his motion to convert.[175]

### J.    Hayes, Case No. 15-40661

This is debtor Oshara Hayes' second bankruptcy in the last five years.[176] Like many other debtors, Ms. Hayes could not afford the medical care she needed and

---

[172]   § 1325(a)(6).

[173]   Case No. 15-40681, Doc. 19.

[174]   The Court finds it unnecessary, therefore, to rule on the additional bases within the U.S. Trustee's objection to confirmation.

[175]   As above, the Court will not make this choice for Ms. Huggins in light of language in the Code permitting dismissal of a case at any time. *See* § 1307(b) ("On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter. Any waiver of the right to dismiss under this subsection is unenforceable.").

[176]   Again, the evidence admitted at trial of this matter was sparse, as counsel for Ms. Hayes elected to offer into evidence only Ms. Hayes' deposition, rather than her live testimony. The only other evidence admitted was the Standing Trustee's record of Ms. Hayes' plan payment history. And again, because the deposition was taken by the U.S. Trustee, it does not elicit the facts that would have been necessary to support Ms. Hayes' burden of proof. There was live cross examination and re-direct of Ms. Hayes at trial, but the facts were not developed in her favor. The Court, therefore, supplements the sparse trial record with facts gleaned from Ms. Hayes' petition and schedules. *See Sherman v. Rose (In re Sherman)*, 18 Fed. App'x 718, 721 (10th Cir. 2001) (noting that "a bankruptcy court may take judicial notice of schedules to the bankruptcy petition filed by the debtor" and that it "may even take notice of schedules, averments and statements filed in prior bankruptcy cases").

wound up with medical debt she could not pay. She was eventually hit with two garnishments. Unable to afford her basic necessities and threatened with the loss of her vehicle, Ms. Hayes turned to the bankruptcy system for relief.

Ms. Hayes filed her first bankruptcy—a Chapter 13 case, in 2011. Under that plan, she proposed to pay $105 a month for 60 months. Ms. Hayes successfully completed almost three years of her five year plan before she fell behind on her plan payments. Her case was eventually dismissed in October 2014. During her previous bankruptcy, Ms. Hayes lived in a house she owned, which has now been foreclosed. Ms. Hayes has since moved into a house owned by her mother.

After the dismissal of her previous case, Ms. Hayes was again garnished by her medical creditors. She was also worried about garnishment from her student loan creditors. At the end of 2014, Ms. Hayes took out a title loan on her car, her only remaining asset, in order to pay bills.

In early 2015, Ms. Hayes began to fall behind on her title loan payments and, worried about the loss of her only mode of transportation to and from work, looked again to the bankruptcy system for relief. Ms. Hayes could not save enough money to hire a lawyer to file a Chapter 7 case—after all, she had had to resort to a high interest title loan to merely save her car. She also felt more comfortable under Chapter 13 because of her previous experience. In her prior bankruptcy, she agreed to assign her tax refund to pay her attorney but Ms. Hayes did not discuss this option for her current bankruptcy. Ms. Hayes received only a small refund of $136 for 2014, so it is unlikely that an attorney would have accepted an assignment of a future tax refund to secure

representation for her even if she had considered assigning it.

The majority of Ms. Hayes' debts consist of medical bills, although she also owes debts to student loan creditors and for the deficiency on her now foreclosed mortgage. The remainder of her debts consist primarily of miscellaneous consumer debt such as credit cards. In total, Ms. Hayes owes approximately $120,000 to her unsecured creditors. Ms. Hayes also owes approximately $2073 in back taxes to the state of Kansas and Arkansas. Ms. Hayes still owes $637 to the title loan creditor on her 2004 Nissan Sentra, which she values at $3850.

When Ms. Hayes filed her case she was working as a front desk clerk at a hotel for approximately $8 an hour, but changed jobs soon after filing due to safety concerns. Ms. Hayes is now employed as a store clerk and has been with her current employer for four months, now earning even less—$7.50 an hour. As a result of this change in employment, her monthly reported employment income of $1425 has decreased.[177] Ms. Hayes supplements her wages by selling handmade jewelry and paintings, but her efforts bring in only sporadic income that is not predictable in timing or amount. Ms. Hayes is entitled to receive $200 a month in back child support for her now adult daughter, but admitted that payment is not consistently received and she does not know how long it will continue. Ms. Hayes also has a claim for $3000 in back rent from former tenants, but does not believe she will receive payments as the tenants do not

---

[177] Ms. Hayes actually reported employment net income of $1091, but this figure reflected a reduction of $333 in monthly garnishments. Because those garnishments have presumably stopped, the Court adds the garnishment figure back into Ms. Hayes' employment income when assessing feasibility.

Case 15-40644    Doc# 96    Filed 12/17/15    Page 96 of 107

have an income to the best of her knowledge. Ms. Hayes anticipates a tax refund for 2015 but cannot estimate its value at this time.

Ms. Hayes' expenses are slim but not unreasonable, at $1292 per month. She budgets $100 a month for rent she pays her mother, who owns the house where she resides. This payment goes primarily to pay property taxes. Ms. Hayes' other monthly expenses are reasonable for a single person household in Topeka: $350 for food, $30 for clothing and laundry, $150 for transportation, $50 for entertainment, and $166 for car insurance. However, Ms. Hayes budgets only $25 a month for medical and dental expenses and nothing for health insurance despite not being insured through her employment and despite the fact that a rough count of her medical creditors listed on schedule F number at least 20—suggesting she has ongoing health care needs and bills.

Ms. Hayes' plan proposes $100 a month payments for an estimated 36 months totaling $3600 over the life of the plan. Ms. Hayes proposes to pay $3180 to her attorney for fees and closing costs, $310 to the Court for filing fees, $637 to Speedy Cash for her title loan, and the remainder to the Trustee for administering the case. On its face, the plan will likely extend to 42 months in order to pay everything listed above. The plan proposes to pay nothing to Ms. Hayes' unsecured creditors. Ms. Hayes was delinquent $23 on her plan payment at trial due to her switch from an employer withholding order to direct payments.

As noted, Ms. Hayes initially proposed to make her Chapter 13 plan payments via an employer wage withholding order. She has now elected to make her payments

directly to the Standing Trustee. Ms. Hayes testified that this decision was fueled by the perceived discomfort of her new employer with her pending bankruptcy. In the words of Ms. Hayes, her employer "made a big deal" about having her plan payments deducted from her paycheck and even questioned Ms. Hayes as to why she hadn't disclosed her bankruptcy when she interviewed for the job.

The U.S. Trustee objected to confirmation of Ms. Hayes' plan as he did to all these cases, arguing that her plan was not proposed in good faith under § 1325(a)(3), that her petition was not filed in good faith under § 1325(a)(7), and that her plan was not feasible under § 1325(a)(6).[178] The U.S. Trustee moved to convert Ms. Hayes' case to Chapter 7 based on the same arguments.[179] In addition, the Standing Trustee objected to confirmation and moved to dismiss this case, arguing that Ms. Hayes' plan was not feasible.[180]

The Court first assesses this case for feasibility, as it finds that to be dispositive. As a preliminary matter, the Court has trouble finding that Ms. Hayes' income is consistent and stable. First, testimony revealed she has had three different employers over the prior four years. Second, she has already changed employers since the filing of the case five months ago, and has only been with her current employer for four months. Third, her relationship with her new employer already appears, at best, rocky. The Court was simply not convinced that it is more likely than not that Ms. Hayes will

---

[178]   Case No. 15-40661, Doc. 26.

[179]   Case No. 15-40661, Doc. 27.

[180]   Case No. 15-40661, Docs. 20 and 21.

be able to maintain consistent employment through the life of a Chapter 13 plan.

The Court also questions the solvency of Ms. Hayes' proposed budget. Considering her history of medical bills and lack of health insurance, it is not clear how a $25 per month medical budget is feasible for Ms. Hayes. Ms. Hayes' income at filing was only $1425, because she cannot rely on receiving her $200 per month child support payments. But this number, already low, has now been reduced by her change in employment. By the time her monthly expenses of $1292 and her plan payment of $100 are deducted from her reduced income, it is unlikely Ms. Hayes' would be able to pay for her medical and other needs. While she may be current on her plan payment this month, one doctor visit could derail her entire budget at any time over the coming years.

The Court finds it unlikely that Ms. Hayes has the present or future capacity to fund a plan payment,[181] and finds that Ms. Hayes' case is not feasible. Based on the evidence received at trial, the Court finds Ms. Hayes has not met her burden of demonstrating that she will likely be able to both make her plan payment and keep current on her necessary or unexpected household expenses for the life of the plan.[182]

---

[181] *See In re Heck*, 355 B.R. 813, 825 (Bankr. D. Kan. 2006) (finding that, even if the debtor's income satisfied § 109(e)'s eligibility criteria, the court could not conclude that the debtor would "be able to make all the payments proposed for the duration of her plan").

[182] *See In re Rose*, 14 B.R. 649, 656 (Bankr. D. Kan. 1981) (finding that understated expenses merited the conclusion that eventually, the debtors would either "be unable to pay the trustee… or will be unable to meet their necessary living expenses") and § 1325(a)(6).

-99-

The U.S. Trustee's objection to confirmation[183] and the Standing Trustee's objection to confirmation[184] based on feasibility are sustained. Ms. Hayes shall dismiss or voluntarily convert her case to Chapter 7 within fourteen days, or the U.S. Trustee may submit an order granting his motion to convert.[185] The Standing Trustee's motion to dismiss based on feasibility is denied as moot.[186]

## IV.    Conclusion

Bankruptcy is a balancing act. This Court strives to balance the needs of debtors and creditors while following the requirements of the Code and the guidance of case law. But the Court does not act in a factual void; instead, it must also consider the practical import of its decisions—the day to day, real-world application of the decisions made in a sterile courtroom. While the balance may never be perfect, the Court's guiding light is the Code as enacted: not as it wishes it was or hopes it will be. The Tenth Circuit has stated:

> The policy of allowing a fresh start does not license debtors to lightly rid themselves of the burden of their indebtedness without an honest attempt at repayment. Yet neither does that policy compel debtors, in Dickensian fashion, to labor for the rest of their lives under the crushing weight of

---

[183]  Case No. 15-40661, Doc. 26.

[184]  Case No. 15-40661, Doc. 20. The Court finds it unnecessary, therefore, to rule on the additional bases within the U.S. Trustee's objection to confirmation.

[185]  As above, the Court will not make this choice for Ms. Hayes in light of language in the Code permitting dismissal of a case at any time. *See* § 1307(b) ("On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter. Any waiver of the right to dismiss under this subsection is unenforceable.").

[186]  Case No. 15-40661, Docs. 20 and 21.

gigantic debt; under our law, the world is not to be made a debtor's prison by a lifelong sentence of penury.[187]

This balance—the protection of a fresh start coupled with the burdens placed by the Code to get there—is the reason the Code has the confirmation requirements found in § 1325.

And those confirmation requirements are necessary. Chapter 13 petitions and plans must be filed in good faith. Plans must be feasible. There are, obviously, many other requirements. The bottom line, though, is that the Code gives most debtors a choice: they can file under either Chapter 13 or Chapter 7. They can choose to utilize the services of counsel—a choice this Court wholeheartedly recommends both for their best interest and for the smooth operation of the Court, or they can choose to proceed pro se with all the attendant risks that choice brings. As long as debtors meet the confirmation requirements, and other statutory hurdles, it is debtors who get to make this choice, hopefully in consultation with competent bankruptcy counsel. The U.S. Trustee does not get a vote, he does not get to substitute his judgment for that of debtors, and the Code simply does not require the "special circumstances," or "heavy burden" standard he seeks when debtors eligible to file under either Chapter 7 or Chapter 13 elect to proceed under Chapter 13.[188]

---

[187] *Mason v. Young (In re Young)*, 237 F.3d 1168, 1178 (10th Cir. 2001).

[188] In argument, the U.S. Trustee insisted his positions were meant to protect vulnerable debtors, essentially arguing that they needed protection from the very counsel each had selected, and suggesting those counsel had acted improperly in not sending these impoverished individuals away to suffer more garnishments and more hardship while they saved or otherwise magically raised the money necessary to fund a Chapter 7. But the testimony was clear and consistent; these Debtors did not have the money, could not save

-101-

It bears repeating: the "primary purpose of the good faith inquiry is to determine under the totality of the circumstances of a case whether there has been an abuse of the provisions, purpose, or spirit of Chapter 13."[189] The Court finds no abuse of the provisions, purpose, or spirit of Chapter 13 by the choices made in the cases discussed above. Yes, there may be no distribution to unsecured creditors. Again, in a perfect world, all debtors would file Chapter 13 plans and repay all their debts, and no creditor would walk away empty handed. But we do not live in that world.

Instead, this is a world where debtors are harassed by daily collection calls for admittedly delinquent debts. Where they are repeatedly required to miss work to attend a cattle call docket to explain why they haven't paid old medical bills. Where they cannot afford to keep the gas on, and feel compelled to incur title or payday loans at exorbitant rates to feed their families. Where their meager wages are reduced even further by garnishments. Where they opt not to seek necessary medical care or take prescribed medication because they cannot afford it. This is the world these Debtors live in, and this real world sometimes requires bankruptcy, even if the debtor cannot save enough to pay the up front attorney's fees required to file a Chapter 7. In *Flygare*

---

up the money in any timely fashion, could not borrow the money, could not pledge assets (they have almost none), and could not wait seven or eight months for the next cycle of tax refunds, assuming they would even be entitled to a refund. They all need bankruptcy relief, and they all need it now. To this point, the U.S. Trustee agreed. The Court is unaware of some magical place these Debtors could go to get pro bono representation. In a perfect world, Debtors would be able to receive competent representation to file Chapter 7 bankruptcies without charge, to ensure they got the best and cheapest fresh start the Code and state exemptions allow them. As stated above, we do not live in that perfect world.

[189] *In re Sandberg*, 433 B.R. 837, 845 (Bankr. D. Kan. 2010).

the Tenth Circuit advised bankruptcy courts to judge "each case on its own facts after considering all the circumstances of the case."[190] The Court has done so, and finds that Debtors have carried their burdens to show good faith.

The Code also requires a debtor to show he can make plan payments while maintaining ongoing monthly expenses of living. This requirement was the downfall of some of the cases under consideration. While a "slim" Chapter 13 budget is not necessarily an indication of a sinking ship, debtors must be able to demonstrate that it is likely they can make their plan payments and comply with their plan in addition to keeping current on their household budget. Before filing a case, debtors and their counsel must look closely at the budget to make that determination. In the cases found to be not feasible, the budget simply did not support the long-term success of the proposed plan.

The Court makes one final observation: the Chapter 13 process in this Division works. It works well. It works well because of the cooperation and congeniality of the local debtor and creditor bars, but it also works well in large part because of the guiding hand of the Standing Trustee, Jan Hamilton, his staff attorney, and the rest of his staff, who have to use their good judgment every day to make difficult decisions about when to object to confirmation, when to move to dismiss or convert, and how to generally process thousands of cases. That the cases monitored by this Standing Trustee have enjoyed a superior plan completion rate to that obtained in most districts

---

[190] 709 F.2d at 1347 (internal quotation marks from *United States v. Estus (In re Estus)*, 695 F.2d 311, 316–17 (8th Cir. 1982) omitted).

across the country is further evidence of a well-functioning Chapter 13 system. The Court is grateful for the processes and procedures Mr. Hamilton has put in place to make the system work so well here.

**It is, therefore, ordered** that the U.S. Trustee's objection to confirmation[191] in the *Ellsperman* case is overruled and his motion to convert[192] is denied. The Standing Trustee's objection to confirmation and motion to dismiss[193] in the *Ellsperman* case are also overruled and denied. The Court sets this case for confirmation hearing on January 27, 2016.

**It is further ordered** that the U.S. Trustee's objection to confirmation[194] in the *Wark* case is overruled and his motion to convert[195] is denied. This case is set for confirmation hearing on January 27, 2016.

**It is further ordered** that the U.S. Trustee's objection to confirmation[196] in the *Parker* case is overruled and his motion to convert[197] is denied. This case is set for confirmation hearing on January 27, 2016.

---

[191] Case No. 15-40609, Doc. 23.

[192] Case No. 15-40609, Doc. 25.

[193] Case No. 15-40609, Docs. 19 and 20.

[194] Case No. 15-40558, Doc. 16.

[195] Case No. 15-40558, Doc. 17.

[196] Case No. 15-40655, Doc. 20.

[197] Case No. 15-40655, Doc. 21.

-104-

**It is further ordered** that the U.S. Trustee's objection to confirmation[198] in the *Blacksmith* case is overruled and his motion to convert[199] is denied. The Standing Trustee's objection to confirmation and motion to dismiss[200] are also overruled and denied. This case is set for confirmation on January 27, 2016.

**It is further ordered** that the U.S. Trustee objection to confirmation[201] in the *Tinkham* case is overruled and his motion to convert[202] is denied. This case is set for confirmation hearing on January 27, 2016.

**It is further ordered** that the U.S. Trustee's objection to confirmation[203] in the *Neu* case is overruled and his motion to convert[204] is denied. This case is set for confirmation hearing on January 27, 2016.

**It is further ordered** that the U.S. Trustee's objection to confirmation[205] based on feasibility in the *Rayton* case is sustained. Ms. Rayton shall dismiss or voluntarily convert her case to Chapter 7 within fourteen days, and if not, the U.S. Trustee shall

---

[198] Case No. 15-40641, Doc. 29.

[199] Case No. 15-40641, Doc. 30.

[200] Case No. 15-40641, Docs. 26 and 27.

[201] Case No. 15-40654, Doc. 18.

[202] Case No. 15-40654, Doc. 19.

[203] Case No. 15-40647, Doc. 25.

[204] Case No. 15-40647, Doc. 26.

[205] Case No. 15-40644, Doc. 22.

submit an order granting his motion to convert.[206] The confirmation hearing set for January 27, 2016 is cancelled. The Standing Trustee shall withdraw his motion to compel an attorney fee itemization,[207] due to his withdrawal of his objection to confirmation and motion to dismiss in this case, and the hearing on that motion to compel is also cancelled.

**It is further ordered** that the U.S. Trustee's objection to confirmation[208] based on feasibility in the *Tetuan/Milholen* case is sustained. Mr. Tetuan and Ms. Milholen shall dismiss or voluntarily convert their case to Chapter 7 within fourteen days, and if not, the U.S. Trustee shall submit an order granting his motion to convert.[209] The Standing Trustee's objection to confirmation and motion to dismiss based on good faith[210] are overruled and denied as moot. The confirmation hearing set for January 27, 2016 is cancelled.

**It is further ordered** that the U.S. Trustee's objection to confirmation[211] based on feasibility in the *Huggins* case is sustained. Ms. Huggins shall dismiss or voluntarily convert her case to Chapter 7 within fourteen days, and if not, the U.S.

---

[206] Case No. 15-40644, Doc. 23.

[207] Case No. 15-40644, Doc. 42.

[208] Case No. 15-40566, Doc. 17.

[209] Case No. 15-40566, Doc. 18.

[210] Case No. 15-40566, Docs. 21 and 22.

[211] Case No. 15-40681, Doc. 19.

-106-

Trustee shall submit an order granting his motion to convert.[212] The confirmation hearing set for January 27, 2016 is cancelled.

**It is further ordered** that the U.S. Trustee's objection to confirmation[213] and the Standing Trustee's objection to confirmation[214] based on feasibility in the *Hayes* case are sustained. Ms. Hayes shall dismiss or voluntarily convert her case to Chapter 7 within fourteen days, and if not, the U.S. Trustee shall submit an order granting his motion to convert.[215] The Standing Trustee's motion to dismiss is denied as moot.[216] The confirmation hearing set for January 27, 2016 is cancelled.

**It is so Ordered**.

###

---

[212] Case No. 15-40681, Doc. 20.

[213] Case No. 15-40661, Doc. 26.

[214] Case No. 15-40661, Doc. 20.

[215] Case No. 15-40661, Doc. 27.

[216] Case No. 15-40661, Doc. 21.